RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

           *v.*

BENJAMIN HENRY SMITH (08-2345) and
BRIAN RONELL GARRETT (08-2366),
                    *Defendants-Appellants.*

Nos. 08-2345/2366

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 05-80955-019; 05-80955-008—Avern Cohn, District Judge.

Argued: March 4, 2010

Decided and Filed: April 7, 2010

Before: SILER and ROGERS, Circuit Judges; BELL, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Sidney Kraizman, KRAIZMAN & KRAIZMAN, Detroit, Michigan, John M. McManus, McMANUS LAW, Birmingham, Michigan, for Appellants. Daniel R. Hurley, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellees. **ON BRIEF:** Sidney Kraizman, KRAIZMAN & KRAIZMAN, Detroit, Michigan, John M. McManus, McMANUS LAW, Birmingham, Michigan, for Appellants. Daniel R. Hurley, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellees.

---

[*]The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

1

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  Benjamin Henry Smith and Brian Ronell Garrett were indicted for their involvement in a large drug conspiracy.  Both defendants pled not guilty, proceeded to trial, and were convicted by a jury.

Smith argues on appeal that a former Internal Revenue Service agent's testimony resulted in reversible error in three ways.  Smith argues that it was improper for the agent to mention that Smith had failed to file tax returns for six years, that it was improper for the agent to state his conclusion that Smith was a "driver" for the cocaine conspiracy, and that it was improper for the district court not to have instructed the jury on the differences between factual, opinion, and summary testimony.  The district court properly sustained an objection to the tax return testimony and struck that testimony from the record, and no further response was necessary.  Allowing the testimony that Smith was a "driver" was not an abuse of discretion because this testimony was part of the agent's expert testimony about the structure of the cocaine conspiracy, a matter not within the ordinary knowledge of jurors.  The failure to instruct the jury about the different forms of witness testimony was an error, but it was not plain error because it neither affected Smith's substantial rights nor had a serious impact on the fairness, integrity, or public reputation of the judicial proceeding.  Smith is therefore not entitled to relief.

Garrett argues on appeal that evidence found during a vehicle stop should have been suppressed, that the jury verdict was not supported by substantial evidence and was against the great weight of the evidence, and that the district court should have instructed the jury that the term "proceeds" in the money laundering statute means "profits."  The evidence from the traffic stop was properly admitted because the vehicle was stopped for speeding and all extensions of the stop were supported by reasonable suspicion.  The evidence presented against Garrett was more than sufficient to sustain the jury verdict.  Any error resulting from the district court's failure to instruct the jury that "proceeds"

means "profits" was not plain because the controlling opinion of the relevant Supreme Court decision expressly stated that a "profits" definition was not appropriate where the laundered money had been acquired from distributing contraband. Garrett is therefore also not entitled to relief.

## I.

The Government charged Benjamin Henry Smith and Brian Ronell Garrett, along with more than twenty other defendants, with crimes committed during their involvement with a large cocaine distribution conspiracy known as the "Black Mafia Family." The conspiracy grew out of a drug organization run by Terry and Demetrius Flenory based in Detroit; the organization eventually extended as far as Los Angeles and Atlanta. A grand jury indicted Smith for conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841 and 846. The indictment alleged that Smith had transported and distributed cocaine on behalf of the conspiracy. The grand jury indicted Garrett for conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841 and 846 and for conspiracy to launder monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h). The indictment accused Garrett of transporting large quantities of money for the conspiracy.

Before trial, Garrett filed a motion to suppress evidence seized during a traffic stop that occurred on January 23, 2003. On that day, Texas Highway Patrolman Jason Henderson pulled over a Lincoln Mark VIII on I-40 in Texas for speeding. A dashboard-mounted video camera recorded the stop.[1] Kim Williams was driving the car, and Garrett was the only passenger. Henderson requested identification from Williams and Garrett. Henderson then asked Williams to accompany him back to the patrol car so that he could issue her a written warning and have his dispatcher check to ensure that Williams's license was valid and that neither Williams nor Garrett had an outstanding warrant. When asked, Williams stated that she was driving a borrowed car and was

---

[1]At the hearing on the motion to suppress, the court viewed the video, but the contents of the video were not transcribed. At trial, equipment errors prevented the parties from hearing the sound from the video, so Henderson narrated the actions recorded by the video. This statement of the facts relies partly on that testimony.

going to Amarillo, Texas, to visit a friend, but she could not provide an address for her friend's residence. She also made apparently contradictory statements regarding when her friend had moved to Amarillo. Henderson then returned to the vehicle to check Williams's story with Garrett. When Henderson asked Garrett where he was going, Garrett told Henderson that they were going to Sherman Oaks, California, to visit relatives. Garrett could not identify a specific relative he was going to visit. While Henderson was questioning Garrett, the dashboard-mounted camera recorded Williams saying to herself, "please say Amarillo, please say Amarillo."

Henderson then issued the written warning and asked Williams and Garrett whether the vehicle contained weapons, drugs, or large amounts of currency. When Williams and Garrett responded negatively, Henderson asked for and received permission to search the vehicle. During this search, Henderson located a metal compartment where a radio speaker ought to have been. Henderson had Williams and Garrett follow him off the highway to a Texaco station so that Henderson could continue the search. Henderson subsequently located a second hidden compartment that contained currency. Henderson arrested Garrett and Williams, and a full search of the vehicle revealed $723,790 in cash. The district court denied the motion to suppress.

The district court held a six-day trial of Smith and Garrett in late November and early December 2007.[2] At trial, the prosecution's first witness was Arnold Boyd.[3] Boyd grew up in southwest Detroit, and had met both defendants, as well as both Terry and Demetrius Flenory, during his childhood. Boyd had been indicted along with Smith and Garrett, and Boyd had pled guilty and agreed to cooperate with the Government in the hope of obtaining a more favorable sentence. In 2002, knowing that Terry Flenory ran a cocaine distribution organization, Boyd joined that organization as a personal driver for Terry Flenory. He testified that his half-brother, Benjamin Johnson, had been the Detroit-area "manager," but that when Johnson had been incarcerated, Boyd had taken

---

[2] The other defendants in the case, including Terry and Demetrius Flenory, pled guilty. Some of the defendants pled guilty on the eve of trial.

[3] The summary of the trial testimony focuses more on the facts relating to Garrett than on the facts relating to Smith because Garrett, unlike Smith, argues insufficiency of the evidence on appeal.

over the Detroit management duties. Boyd was responsible for processing the cocaine when it arrived in Detroit, selling the cocaine to distributors, and accounting for the proceeds. Boyd testified that, to facilitate the transportation of cocaine and of drug proceeds, the organization had hired a man in Florida to install hidden, vacuum-sealed compartments in a number of vehicles. Boyd also testified about a number of organization-owned properties, including a property known as "the Whitehouse" in Lithonia, Georgia (near Atlanta), a property on Mulholland Drive in Los Angeles, and a property known as "the Jump" in Encino, California. He testified that from Detroit, he had distributed cocaine to New York, Alabama, Missouri, Georgia, and the District of Columbia and that he had distributed drug proceeds to Missouri, Texas, and California.

Boyd specifically identified Garrett and Smith as drivers for the organization. Boyd testified that Garrett had generally transported drug proceeds for the organization, but that Garrett had transported cocaine as well, on occasion. On cross-examination, Boyd stated that sometimes members of the organization would hide cocaine under the money being transported by Garrett, so that Garrett would unwittingly transport cocaine. Boyd said this was done because Garrett preferred to transport only money, hoping to avoid long prison sentences. Boyd also testified that Smith had often transported both cocaine and drug proceeds. Boyd testified that he had personally paid both Smith and Garrett for acting as drivers for the organization. Boyd stated that within the organization, Garrett was known as "White Boy" and Smith was known as "Big Ben."

Boyd explained that the organization used ledgers to track cocaine shipments, expenses, and proceeds. Using a ledger seized from his house, Boyd explained the way the notations were made. The Government also introduced a ledger seized from the Lithonia Whitehouse, which was not a ledger Boyd had maintained but which Boyd could identify as a ledger maintained by another member of the organization. Boyd explained that one entry in that ledger recorded that Smith was reimbursed for $120 in hotel expenses, and another entry recorded a payment of $18,000 to Smith for

transporting cocaine or drug proceeds.[4]  In a second ledger seized from the Lithonia Whitehouse,  Boyd identified one entry recording that Smith was paid $4,500 for transporting drug proceeds.  A second entry recorded that Garrett and his girlfriend Williams were paid $4,500 for transporting drug proceeds and given an additional $500 for return airfare.  Another entry recorded that Smith had arrived at the Lithonia Whitehouse with $230,000.  Yet another entry recorded that Garrett and Williams were reimbursed for $500 in fuel expenses.  A final entry from that ledger recorded a payment of $5,500 for Smith along with $300 in return airfare.  Boyd also testified that he had seen both Smith and Garrett at the Lithonia Whitehouse.

Boyd also identified and explained entries from a ledger seized from the Jump in California.  Entries from that ledger recorded that Smith had five times departed from California with quantities of cocaine ranging from 66 kilograms to 160 kilograms.

Boyd identified and explained a number of tapes of wiretapped phone calls.  In one, Terry Flenory asks Garrett to go with a friend to Florida and drive a BMW to Detroit.  Boyd explained that Garrett typically drove with someone else, usually his girlfriend Williams, because he did not have a valid driver's license because of vision problems.  Garrett still drove sometimes despite his lack of a license.  In a second phone call, Garrett discusses with Terry Flenory the fact that he was stopped in Florida while transporting the BMW for Flenory.  Garrett states that the Florida police connected that incident with the stop of Garrett and Williams in Texas with the large amount of currency.  When he was stopped in Florida, however, Garrett was not transporting either currency or cocaine.  In another tape, Garrett calls Johnson asking to purchase approximately 125 grams of cocaine.  Another tape recorded Garrett calling Johnson in the hope of contacting Boyd so that Garrett could be paid.  Other tapes recorded Garrett discussing various matters with other members of the organization.

---

[4]Later testimony established that this was almost certainly payment for transporting cocaine. Payment for transporting cocaine was generally around $15,000 per stop if the cocaine was being transported in one of the organization's large vehicles; payment for transporting currency was generally around $5,000 per stop.  Smith and Garrett are always referred to as "Big Ben" and "White Boy" or "WB" in the ledgers.

On cross-examination, Boyd admitted that prior to his arrest, he was a "lying, cheating drug dealer." But he stated that after his arrest, he had "turned [his] life over to God," such that he was now a truthful person.

Drug Enforcement Agency Agent Robert Bell testified to some aspects of his investigation of the Flenory organization. Nathan Gleton, another driver for the organization, testified that he was paid between $8,000 and $25,000 for transporting cocaine depending upon the length of the trip. Henderson testified at trial in accordance with his testimony during the suppression hearing. Bruce Martin testified that he was the first driver for the organization, and that he had continued driving after the organization expanded. He testified that he had seen Garrett at the motels where he was staying in Los Angeles and St. Louis. He stated that he knew, from Johnson, that Garrett was a driver for the organization.

Eric Bivens testified that he worked as an accountant, of sorts, for the Flenory organization. He testified that Garrett had performed a number of small tasks for Terry Flenory, including grocery shopping. He also stated that Terry Flenory had once mentioned to him that Garrett was transporting currency with Williams. Bivens did not otherwise know of Garrett's doing anything other than incidental work for Terry Flenory. Bivens described Garrett and Terry Flenory as friends. Charles Parson was another driver for the organization. He testified that he knew Garrett to be a member of the organization, and that Parson had seen Garrett at the organization's properties where drugs and currency were loaded and unloaded. Parson had driven with Williams, and Parson had seen Garrett arrive in St. Louis in one of the organization's modified vehicles. Parson also testified to some knowledge of Smith's involvement in the organization. John Martin, a City of Lincoln Park police officer, testified that he had once pulled Garrett over for a traffic violation when Garrett was driving. Other state and federal agents testified to other aspects of the investigation into the Flenory organization, and one other member of the organization testified about the structure of the organization and about Smith's involvement in the transportation of cocaine.

Smith's appeal relates primarily to the testimony by the prosecution's final witness, former Internal Revenue Service (IRS) Agent Frank Scartozzi.    The Government hired Scartozzi to assist in the investigation of the Flenory organization; he described that his job was "to basically follow the money." He explained generally how drug organizations launder money and stated that members of drug organizations who transport drug proceeds are part of that money laundering process.  He then began to describe his investigation into Smith's financial records.  He testified that, according to a report prepared by the IRS, Smith had not filed tax returns for the years 1999-2004.  As the prosecution was beginning ask Scartozzi additional questions about Smith's tax return history, Smith's attorney objected to the relevancy of Smith's failure to file taxes during that period.   The prosecution argued that the failure to file tax returns was evidence that rebutted Smith's claim that he was legitimately employed as Terry Flenory's chauffeur, bodyguard, or both.  Noting that Smith had not yet introduced any evidence that he was legitimately employed, the district court sustained the objection of Smith's attorney.  The court, after a request from Smith's attorney, also instructed the jury to "disregard the testimony on the issue of tax returns."  The prosecution then asked Scartozzi to identify a document.  Scartozzi responded, "That is also a response back from the [IRS] on Brian Garrett's filing history, which showed that for the years 1999 through 2003 he had not filed tax returns with the IRS."  Garrett's attorney objected, and the court sustained the objection.

Scartozzi's testimony then focused on the structure of the Flenory organization and the roles of various parties within the organization.  After Scartozzi testified about the role of drivers, the prosecutor asked Scartozzi for examples of drivers within the organization.  Smith's attorney objected.  The prosecutor argued that this was valid summary testimony about Scartozzi's investigation of the Flenory organization, and the court overruled the objection.  Scartozzi identified both Smith and Garrett as drivers.  After an attempt by the prosecutor to question Scartozzi further about the structure and workings of the organization, the court instructed the prosecutor that "the testimony regarding the scope of the conspiracy generally is now cumulative, doubly cumulative, triply cumulative, and if you don't have anymore testimony from this witness that relates

to these two defendants, you conclude your examination." The court continued, "All of this is designed to prejudice them. They are minor participants in this very large conspiracy, and you are coming perilously close to blowing your case." The prosecutor agreed to ask only one final question. Garrett's attorney then objected "to the line of questioning." After a brief discussion between the district court, the prosecutor, and Garrett's attorney, the prosecutor concluded her examination of Scartozzi without further questions. On cross-examination, Scartozzi testified that he had never personally seen Garrett driving a car or possessing large amounts of money. On redirect, Scartozzi testified that his investigative responsibilities did not include surveillance. The agreed jury instructions did not include any instructions regarding either expert testimony or summary testimony.

The defendants' attorneys then moved for acquittal. After the motions were denied, Garrett called one of his father's second cousins, Jerry Garrett. Jerry Garrett testified that he and Garrett had family in Sherman Oaks, California, and that Garrett would have been welcome to visit there. Garrett then rested. John Sadler, a first cousin of Smith, then testified for Smith. His testimony was designed to rebut the inference that a taped phone call of Smith recorded him discussing how to avoid police traps so that he would not be caught with cocaine or drug proceeds; Sadler testified that Smith was attempting to avoid police because he had purchased fireworks from Ohio that were illegal in Michigan. Smith then rested. The defendants renewed their motions for acquittal, and the court rejected those motions. The agreed instructions, as read to the jury, stated the following elements of conspiracy to launder monetary instruments:

> First, that the defendant entered into an unlawful agreement with one or more persons.
>
> Second, that the defendant conducted a financial transaction.
>
> Third, that the financial transaction involved property that represented the *proceeds* of illegal activity.
>
> Fourth, that defendant knew that the property involved in the financial transaction represented the *proceeds* of a specified unlawful activity.

Fifth, that the defendant had the intent to promote the carrying on of unlawful activity to engage in conduct and did so knowingly and voluntarily.

(emphasis added).

The jury found Smith guilty of conspiracy to possess with intent to distribute and to distribute cocaine, and further found that the conspiracy involved more than five kilograms of cocaine. The jury found Garrett not guilty of conspiracy to possess with intent to distribute and to distribute cocaine, but guilty of conspiracy to launder monetary instruments.

Both defendants timely appealed. Smith argues on appeal that he was entitled to a mistrial based on the prosecution's questioning of Scartozzi about Smith's tax records, that the district court should not have admitted Scartozzi's conclusion that Smith was a driver for the Flenory organization, and that the jury instructions should have distinguished between opinion, fact, and summary testimony. Garrett argues on appeal that the district court ought to have granted his motion to suppress, that the evidence was insufficient to support a guilty verdict, and that the jury instructions should have stated that the term "proceeds" as used in 18 U.S.C. § 1956(a)(1) means "profits."

**II.**

**A.**     **The mention of Smith's failure to file his income tax returns for 1999-2004 was not sufficiently prejudicial such that his conviction should be reversed.**

The district court did not abuse its discretion by sustaining the objection to the tax record-related testimony but not declaring a mistrial. *See United States v. Wimbley*, 553 F.3d 455, 460 (6th Cir. 2009) (stating the standard). In *United States v. Rudolph*, 403 F.2d 805, 806 (6th Cir. 1968), this court stated that the relevant test was whether "the question asked . . . was so clearly improper and prejudicial to the defendants that the harm could not be erased by any instruction which the court might give." The questions about Smith's tax returns do not meet this test. Evidence about Smith's failure to file tax returns was arguably relevant to Smith's claim that he was legitimately employed. The district court found this rationale insufficiently persuasive, but because

the returns' admissibility was at least debatable, the question does not meet the *Rudolph* "clearly improper" test. Further, the evidence of possible failure to file tax returns was only marginally prejudicial. For the jury to have drawn any improper conclusion from the tax records, the jury would have had to conclude that (1) the defendant was required to file taxes, (2) his failure to file taxes was therefore a crime, and (3) his criminal failure to file tax returns makes it more likely that he was involved in a conspiracy to distribute cocaine. This is not a particularly strong set of inferences, and thus is not sufficiently prejudicial under *Rudolph* to require a mistrial.

The facts of *Rudolph*, also a narcotics conspiracy trial, are distinguishable from those of the present case. In *Rudolph*, questions by the prosecutor suggested (1) that two of the defendants had arranged for the murder of a non-party and (2) that one of the defendants had been previously convicted of a narcotics violation. 403 F.2d at 806. Both of these criminal accusations are far more prejudicial in a narcotics conspiracy trial than the suggestion that a defendant might have illegally failed to file tax returns.

Because the tax return testimony was not so clearly improper and prejudicial to Smith that the harm could not be erased by any instruction which the court might give, the district court's decision not to grant a mistrial is not reversible error.

**B.     The testimony by Scartozzi about (1) the structure of the Flenory organization and (2) the role played by Smith within that organization does not require a reversal of Smith's conviction.**

It was not plain error for the district court to admit Scartozzi's testimony about the structure of the Flenory organization, and the district court did not abuse its discretion by admitting Scartozzi's testimony that Smith and Garrett were drivers within the organization.

**1.     The structure of the Flenory organization**

First, Scartozzi testified as to the general structure of the Flenory organization, specifically delineating the different job responsibilities of what he termed the officers, supervisors, and drivers of the organization. Smith's attorney did not object to this

testimony, and "[t]his court reviews issues involving the admissibility of expert testimony for plain error where no objection was made at trial," *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007). Even under the more demanding abuse-of-discretion standard applied when an objection is made, "[t]his court 'has allowed police officers to testify as expert witnesses about criminal activity since knowledge of such activity is generally beyond the understanding of the average layman.'" *United States v. Bender*, 265 F.3d 464, 472 (6th Cir. 2001) (quoting *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996)).[5] Especially in light of Scartozzi's strong credentials, his testimony describing the general nature of the Flenory organization falls within the *Bender* rule, and admitting it was not plain error.

### 2. The role played by Smith within the Flenory organization

In the second portion of his testimony, Scartozzi identified specific individuals as fulfilling certain roles within the Flenory organization. For instance, Scartozzi identified Terry and Demetrius Flenory as officers, and Boyd as a manager. The prosecutor then asked Scartozzi to identify the drivers. Smith's attorney objected that Scartozzi was merely testifying to "his own opinion and conclusions." The prosecutor responded that Scartozzi had investigated the case for several years, and that Scartozzi was "entitled to summary testimony of his investigation." The district court overruled the objection, and Scartozzi identified Smith and Garrett as drivers. Shortly thereafter, the district court told the prosecutor to conclude her examination of Scartozzi as his testimony was cumulative and in danger of being prejudicial.

Allowing Scartozzi to identify the defendants as drivers was not an abuse of discretion.[6] This court has previously allowed an IRS agent to provide summary

---

[5]*Bender* and *Thomas* both note that such testimony is admissible and not unfairly prejudicial "particularly when the district court provides cautionary instructions to the jury." *Bender*, 265 F.3d at 472; *see also Thomas*, 74 F.3d at 683. Smith's challenge to the jury instructions in this case is addressed in the next section.

[6]The Government suggests that this claim ought to be reviewed for plain error, arguing that Smith's argument on appeal is different from his objection at trial. Because the trial objection that Scartozzi's testimony was "his own opinion and conclusions" could reasonably be construed as an objection that Scartozzi's conclusion that Smith was a "driver" was not properly the subject of expert or summary testimony, we assume that the less deferential standard of review applies.

testimony where the agent "did not comment directly on any specific witness' credibility but rather gave his view of the events." *United States v. Sturman*, 951 F.2d 1466, 1480 (6th Cir. 1991). In *Sturman*, the defendant created numerous fictitious corporations as part of a scheme to conceal income. *Id.* at 1471-72. A testifying IRS agent "summarized the evidence and testified that the evidence showed a connection between the defendants, Swiss bank accounts, and a failure to report signature authority and income." *Id.* at 1480. The *Sturman* court held that summary testimony is admissible where "the judge charges the jury as to all the elements necessary for conviction, where the summary is intended to aid the jury in organizing proof, and where the summary is not inflammatory or prejudicially worded." *Id.* (citing *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979)). Under this test using an abuse of discretion standard, *see United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007), the district court's decision to admit this testimony does not require a reversal. This case involves a large drug conspiracy that, although less complicated than the income tax scheme at issue in *Sturman*, still was plausibly confusing to the jury. Specifically, the prosecutor attempted to question Scartozzi as to the relationship between the drivers and the crimes of conspiracy to distribute cocaine and conspiracy to launder money. This testimony was, in part, presumably elicited because it might not have been obvious to the jury why transporting money furthered a money laundering conspiracy as defined by 18 U.S.C. § 1956(h). Explaining that Smith was a driver was necessary such that Scartozzi's testimony as to the role of drivers within the organization was relevant to the case against Smith.

This conclusion is consistent with *United States v. Cruz*, 981 F.2d 659 (2d Cir. 1992). In *Cruz*, the Second Circuit reversed a cocaine conspiracy conviction because the "government's principal use of [the police expert]'s testimony was . . . to bolster [a fact witness]'s version of events." *Id.* at 663. The police officer testified that the fact witness had described a typical set of circumstances. Because this testimony was, in effect, a statement by the police expert that the fact witness was believable, and because the expert additionally testified that the ethnicity of the defendant was part of what made the story believable, the court reversed the conviction. *Id.* The testimony in the present

case was not designed to make the conspiracy described by Boyd and the other witnesses seem plausible and thus bolster their testimony, as there was no dispute that the Flenory organization existed, distributed large amounts of cocaine, and laundered money. Scartozzi's testimony attempted to clarify the role played by Smith and Garrett within that organization; this evidence may have been cumulative given the extensive testimony of Boyd and others, but it did not have the same improper bolstering effect as the testimony in *Cruz.*

Because the structure of a drug conspiracy is not within the knowledge of an average juror, the admission of Scartozzi's testimony into evidence was not reversible error.

**C.     It was not plain error for the district court not to instruct the jury about (1) the distinction between fact and opinion testimony and (2) the limited purpose of summary testimony.**

Although it was an error to fail to instruct the jury about the distinction between fact and opinion testimony and the limited purpose of summary testimony, Smith has not shown that these errors affected substantial rights or had a serious impact on the fairness, integrity, or public reputation of the judicial proceeding.  *See United States v. Jones*, 108 F.3d 668, 670 (6th Cir. 1997) (en banc) (stating the standard).

### 1.     The distinction between fact and opinion testimony

Under *United States v. Lopez-Medina*, 461 F.3d 724, 745 (6th Cir. 2006), it is an error to permit a witness to testify both as a fact witness and as an expert witness unless there is a "cautionary jury instruction regarding the [witness's] dual witness roles" or "a clear demarcation between [the witness's] fact testimony and expert opinion testimony."  Here, Scartozzi testified as a fact witness about, for example, the property ownership of Terry Flenory, and also as an expert witness about, for example, typical money laundering practices.  It was therefore error not to instruct the jury about dual-role testimony.

However, because defense counsel did not object to the jury instructions, any error is subject to plain error review. *Jones*, 108 F.3d at 670. Smith cannot show plain error. Under plain error review, Smith must show that the error "affected substantial rights" and that it "seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id.* To show that the error affected substantial rights, Smith must generally show that the error was prejudicial, that is, that it affected the outcome of the district court proceedings. *Id.* at 672. A failure to instruct can prejudice the defendant because insufficient instructions do not "guard against a [jury's] mistakenly weighing opinion testimony as if the opinion were fact, nor [do such instructions] instruct the jury that they are free to reject the opinions given." *Lopez-Medina*, 461 F.3d at 744. Smith has not shown either form of prejudice here.[7] Most of Scartozzi's testimony related to the general structure of the Flenory organization—which was undisputed—or to the typical forms of money laundering in such organizations, which was only relevant to the prosecution of Garrett. Smith has not shown that any of this testimony was prejudicial to him, even if the jury was confused as to the distinction between fact and opinion testimony. Thus, because the lack of instructions regarding the distinction between fact and opinion testimony did not lead to prejudicial inferences against Smith, and because there were no other evidentiary errors, the erroneous failure to instruct in this case does not require reversal. *Cf. United States v. Vasquez*, 560 F.3d 461, 470-71 (6th Cir. 2009); *United States v. Martin*, 520 F.3d 656, 659-60 (6th Cir. 2008). For the same reason, Smith cannot show that the error seriously affected the fairness, integrity or public reputation of judicial proceedings.

---

[7]In *Lopez-Medina*, the court concluded that the defendant had shown sufficient prejudice to warrant a reversal of his conviction. 461 F.3d at 745, 749. The court, however, did not hold that the failure to instruct the jury about the distinction between fact and opinion testimony was itself sufficiently prejudicial to constitute plain error. *See id.* at 745, 749. Instead, the court concluded that the failure to instruct and the erroneous admission of the criminal histories of the defendant's acquaintances were sufficiently prejudicial such that the court could not conclude "beyond a reasonable doubt that the error[s] complained of did not contribute to the verdict obtained." *Id.* at 749 (alteration in original); *see also id.* at 745. This harmless error standard applied because the defendant had preserved the objection regarding his acquaintances' criminal histories. *See id.* at 741. Here, where Smith has not preserved the evidentiary objections at issue, the higher prejudice requirements of plain error review apply.

**2.     The limited purpose of summary testimony**

It was also error not to give a cautionary instruction regarding summary testimony, for summary testimony "should be accompanied by a limiting instruction which informs the jury of the summary's purpose and that it does not constitute evidence." *United States v. Vasilakos*, 508 F.3d 401, 412 (6th Cir. 2007) (citing *United States v. Campbell*, 845 F.2d 1374, 1381 (6th Cir. 1988)).

Smith cannot show plain error with respect to this jury-instruction error. The only summary testimony relevant to Smith was Scartozzi's identification of Smith as a driver for the organization. But this statement did not go precisely to the main issue at trial: whether Smith was not just someone who drove vehicles for the Flenory organization, but also someone who knowingly drove vehicles containing cocaine. The single identification of Smith as a driver by Scartozzi did not bear sufficiently upon this question to prejudice Smith, particularly in light of Scartozzi's admission on cross-examination that he had never observed Smith with any cocaine. Thus, Smith cannot show that this jury-instruction error either prejudiced him or seriously affected the fairness, integrity or public reputation of judicial proceedings. Thus, because any errors in the jury instructions did not constitute plain error, they also do not warrant reversal.[8]

**D.     Henderson's stop of the car containing Garrett was not in violation of the Fourth Amendment.**

Henderson's stop of Garrett did not violate the Fourth Amendment because Henderson had probable cause to stop Garrett's vehicle, and none of Henderson's subsequent actions unconstitutionally extended the stop. Before Henderson pulled over Garrett's vehicle, Henderson paced the vehicle as traveling 74 miles per hour in a 70 mile-per-hour zone. This was sufficient to justify the stop, as "[a]n officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). Once

---

[8]Garrett joined the brief of Smith regarding the issues addressed in sections II.A.-II.C of this opinion. To the extent that Smith's claims apply the same way to Garrett, we reject them for the reasons stated under headings II.A.-II.C. To the extent that the claims might apply in a different way to Garrett, Garrett has forfeited those applications by not developing any such argument on appeal.

a stop begins, however, detaining the motorist "any longer than is reasonably necessary to issue the traffic citation" requires "reasonable suspicion that the individual has engaged in more extensive criminal conduct." *Id.* (quoting *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)). Under this standard, it was not an unnecessary extension of the stop for Henderson to question Williams as he issued her the ticket. Nor was it inappropriate for Henderson to check both whether Williams and Garrett had valid identification and whether they had any outstanding warrants. *See id.* at 542. When Henderson questioned Williams, Williams stated that she was going to Amarillo to visit a friend, but she did not know the friend's address; she then said both that her friend had just moved to Amarillo and that Williams knew where the friend lived because she had been there before.

By this time, Henderson had the following evidence of criminal activity: (1) the car was driving in a known drug corridor, (2) the car was owned by a third party, (3) Williams told an implausible story about her destination, (4) Williams seemed to contradict herself regarding when her friend had moved to Amarillo, and (5) Garrett's identification had come back as a false number. This is sufficient reasonable suspicion to ask Williams to stay in the police car while Henderson checked her story with Garrett. When Garrett contradicted Williams's story as to their destination, that—in addition to the prior evidence—gave Henderson reasonable suspicion to extend the stop further and ask for permission to search the vehicle. Henderson asked for, and received, such permission. A brief search of the vehicle revealed a false compartment. This gave Henderson sufficient reasonable suspicion to ask that Williams and Garrett accompany him to a safer location to complete the search. That search revealed a second compartment containing large amounts of currency. After Williams and Garrett were arrested, an additional search revealed a third compartment.

Because the initial stop was supported by probable cause and because each extension of the stop was supported by reasonable suspicion of additional criminal activity, the evidence obtained from the stop was admissible.

**E.     The jury verdict convicting Garrett was supported by substantial evidence, and the verdict was not against the great weight of the evidence.**

A rational trier of fact could have found Garrett guilty beyond a reasonable doubt, and the evidence at trial does not preponderate heavily against the verdict. *See United States v. Solorio*, 337 F.3d 580, 588-89 (6th Cir. 2003) (stating the relevant standards). Garrett challenges the district court's denial of his renewed motion for acquittal and motion for a new trial. When reviewing the denial of a motion for acquittal, this court "affirms the decision if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *Id.* at 588 (internal quotation marks omitted).

Applying that standard, the evidence at trial showed the following: Boyd, an admitted member of the Flenory organization, testified that he had personally loaded cars with currency to be driven by Garrett, probably more than ten times. Boyd stated that Garrett knew he was transporting drug proceeds, but that occasionally others would sneak cocaine into the vehicles he was driving as well. Boyd stated that he had personally paid Garrett for transporting currency. Boyd stated that, in a recorded conversation between Johnson and Garrett, Garrett was attempting to contact Boyd so that Garrett could be paid. Boyd testified that Garrett had been present at multiple Flenory organization properties. A ledger recovered from the Lithonia Whitehouse contained an entry indicating that Garrett and Williams were jointly paid $4,500 for transporting money or cocaine for the Flenory organization and that they were reimbursed for $500 of plane expenses. This was consistent with testimony from Parson that drivers were paid "$5000 per stop" for "money runs." The larger amounts of money paid to other drivers were for the transport of cocaine, for which the regular payment was between $10,000 and $15,000 per stop. Another ledger entry recorded a payment to Garrett for fuel reimbursement. Boyd finally testified specifically that he had seen Garrett drive vehicles.

Consistent with the testimony that Garrett and Williams had transported drug proceeds on behalf of the Flenory organization, Henderson testified to the stop where he

had discovered that a vehicle driven by Williams, and in which Garrett was a passenger, contained $723,790 in hidden compartments.  Martin, an admitted driver for the Flenory organization, testified that he had seen Garrett on numerous occasions in the locations where drivers stayed.  Parson corroborated this testimony.  Martin also testified that he had seen Garrett drive, and that he also knew Garrett to be a driver for the Flenory organization.  Bivens, another member of the Flenory organization, remembered Terry Flenory's once stating that Williams and Garrett were "on the road with some money."  This combined evidence was plainly sufficient for a rational trier of fact to find Garrett guilty.

An appellate court reviewing a denial of a Rule 33 motion for a new trial is "limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does not preponderate heavily against the verdict is a clear and manifest abuse of discretion."  *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (internal quotation marks omitted).  Based on the evidence identified above, Garrett cannot show such an abuse of discretion.  Garrett is therefore not entitled to acquittal or a new trial.

**F.     It was not plain error to fail to instruct the jury on the difference between "profits" and "proceeds" under the money laundering statute.**

Under *United States v. Kratt*, 579 F.3d 558 (6th Cir. 2009), it was not plain error to fail to instruct the jury that "proceeds" under 18 U.S.C. § 1956 meant "profits."  Title 18 U.S.C. § 1956(a)(1)(A)(i) provides criminal penalties for anyone who, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity . . . ."  The statute also criminalizes conspiracy to violate that provision.  18 U.S.C. § 1956(h).  In *United States v. Santos*, 128 S. Ct. 2020 (2008), the Supreme Court held that a money-laundering conviction of a man involved in an illegal gambling operation was improper because, at least in the context of that case, "proceeds" under the statute meant "profits" as opposed to "receipts," and

the Government had not proven that the defendant's action had involved profits.  *See id.* at 2031.  This court has interpreted *Santos* to hold that

> "[P]roceeds" does not always mean profits, as [the *Santos* plurality] concluded; it means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase.

*Kratt*, 579 F.3d at 562 (first alteration in original).  As Justice Stevens made clear in his concurring opinion in *Santos*, the predicate offense of conspiracy to distribute cocaine does not fall within the category of offenses for which "proceeds" means "profits."  *See Santos*, 128 S. Ct. at 2032 & n.3 (Stevens, J., concurring).  Thus, under *Kratt*, there was no plain error.

This conclusion is supported by Justice Stevens's opinion concurring in *Santos*.  Justice Stevens cast the necessary fifth vote for the outcome in *Santos*, but he refused to hold that "proceeds" under the statute always means "profits."  *See id.* at 2032-33.  Justice Stevens stated specifically that "the legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized criminal syndicates involving such sales," and he stated that he did not agree with the plurality that "the rule of lenity must apply to the definition of 'proceeds' for these types of unlawful activities."  *Id.* at 2032 & n.3.  A majority of the Court (Justice Stevens plus the dissenting Justices) explicitly preserved the possibility that "proceeds" does not necessarily mean "profits" when a member of a drug conspiracy is prosecuted under § 1956.  *Id.*; *id.* at 2035-36 (Alito, J., dissenting).  Thus, *Santos* itself makes clear that it does not apply to the present situation, and any error in not instructing the jury that "proceeds" means "profits" was not plain.

Finally, in an unpublished opinion, this court has previously held that it is not plain error to omit a jury instruction that "proceeds" means "profits" outside of the context of illegal gambling opportunities.  *United States v. Haque*, 315 F. App'x 510, 525 (6th Cir. 2009).  In *Haque*, the defendant Haque was convicted of laundering money gained through a conspiracy to defraud the United States.  *Id.* at 516.  Haque challenged

the jury instructions because they did not define "proceeds" under § 1956 as "profits." This court stated that, because Haque's conviction did not involve an illegal gambling organization, "the meaning of *Santos* as applied to this case is uncertain." *Id.* at 525. Noting that the defendant had not presented evidence that the laundered money had not been profits, we concluded that "the district court did not commit plain error by failing to instruct the jury *sua sponte* that proceeds meant profits." *Id.* The same reasoning applies here.

## III.

For these reasons, we **AFFIRM** the convictions of Smith and Garrett.