NOT RECOMMENDED FOR PUBLICATION
File Name: 11a0622n.06

Nos. 08-1925/1927

**FILED**

*Aug 26, 2011*

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| CHRISTIAN BEVELLE | ) | |
| and DANIEL J. RENDON, | ) | OPINION |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| _____ | ) | |

Before: BOGGS, GILMAN, and COOK, Circuit Judges.

**RONALD LEE GILMAN, Circuit Judge.** During a joint trial with separate juries, Christian Bevelle and Daniel J. Rendon were found guilty of conspiring to possess cocaine with the intent to distribute the drug. They each assert that various rulings by the district court prevented them from receiving a fair trial. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

These cocaine-conspiracy cases grew out of an investigation into Alvin Broadnax's cocaine-distribution organization. In the early summer of 2000, Broadnax was unemployed and going into debt caring for his handicapped child. To obtain money, he decided to start dealing in cocaine. He went to Bevelle, his friend for over 20 years, and told Bevelle that he wanted to make a "wad of money" like the one Bevelle had just shown him.

Bevelle agreed to help Broadnax get on his feet in the drug trade by providing him with an ounce of cocaine to sell the next day. Broadnax saw Bevelle get the drug from Rendon. Broadnax soon got two more ounces from Bevelle and gradually progressed to selling larger quantities of cocaine that he purchased from Rendon directly.

He eventually worked up to buying five kilograms of cocaine at a time from Rendon. Although Bevelle stopped supplying Broadnax once the latter began purchasing his drugs directly from Rendon, Bevelle continued to be involved in Broadnax's drug trade in various ways, such as by sending him customers and telling him how to handle customer complaints. Broadnax viewed Bevelle as his boss.

In March 2002, an informant told FBI Special Agent Richard Wozniak that Broadnax was a multi-kilogram cocaine dealer who sold the drug for approximately $24,000 per kilogram. The FBI obtained pen register and toll information for Broadnax's cell phone number—which allowed them to obtain a list of the phone calls that Broadnax had received or made—in order to identify his customers and suppliers. From March through November 2002, Broadnax called Bevelle 472 times and Rendon 87 times. The informant purchased cocaine from Broadnax in April 2002 under government surveillance.

After obtaining court authorization on December 6, 2002, the FBI wiretapped Broadnax's cell phone to listen in on actual conversations. The wiretap effectively ended on December 17 because the government on that date raided the house where Broadnax kept his drugs, causing him to cease using his cell phone. During that time, 1,127 calls were intercepted, out of which 150 were

2

considered pertinent. Nineteen of these pertinent calls were heard at trial along with transcripts of the conversations.

As part of the investigation, Agent Wozniak interviewed Rendon on the front porch of his home in June 2003. Agent Wozniak played Rendon some of the telephone calls that were recorded during the wiretap of Broadnax's cell phone. Rendon at first denied that it was his voice, but then admitted that it was his voice after a particular call was played again. Rendon then made several incriminating statements.

Bevelle was arrested in February 2005. He was interviewed by law-enforcement officers after being given his *Miranda* warnings. Among other things, Bevelle stated that the most cocaine he had seen in Rendon's possession was 250 grams. Bevelle also said that Rendon could supply a kilogram of cocaine for $24,000. He further acknowledged that he had introduced Broadnax and Rendon to each other in 2002 after Broadnax told Bevelle that Broadnax needed to find a supplier of cocaine. Bevelle was thereafter aware that Broadnax was purchasing cocaine from Rendon, eventually progressing to buying five kilograms at a time.

Broadnax was indicted for drug trafficking in April 2004. He agreed to cooperate with the government's prosecution of others in exchange for a reduced sentence. Broadnax pled guilty, and later received a reduced sentence of 43 months' imprisonment as a result of his cooperation.

Bevelle and Rendon were indicted on one count of conspiring to possess cocaine with the intent to distribute the drug, in violation of 21 U.S.C. §§ 841(a) and 846. The indictment also included two forfeiture counts against Rendon.

3

A joint trial for Bevelle and Rendon took place in October 2007, although separate juries were used for each defendant. Some of the proof was heard by both juries simultaneously, while other evidence and testimony was presented to only one or the other of the juries. The respective juries found each defendant guilty. Bevelle was found guilty of conspiring to possess 500 grams or more of cocaine with the intent to distribute the drug, while Rendon was found guilty of the same conduct at the higher level of five kilograms or more of cocaine. After Rendon's guilty verdict, a criminal-forfeiture hearing was held before the jury. The jury returned a special verdict finding that Rendon's proceeds from drug trafficking amounted to $600,000.

The district court sentenced Bevelle to 60 months' imprisonment and sentenced Rendon to 120 months' imprisonment. Both defendants have timely appealed.

## II. ANALYSIS

Bevelle raises two issues on appeal and Rendon raises three. We consider each in turn.

### A.    Bevelle's *Batson* challenge

The first issue raised by Bevelle is whether the district court erred in dismissing Bevelle's *Batson* challenge. "In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause prohibits purposeful racial discrimination in the selection of a jury." *United States v. Ferguson*, 23 F.3d 135, 141 (6th Cir. 1994). *Batson* established a three-part framework that courts use to determine if the government purposefully excluded a potential juror based on the juror's race. *Batson*, 476 U.S. at 94-98. The defendant must first establish a prima facie case of purposeful racial discrimination in the selection of the potential juror. *Id.* at 96. Second, if the defendant clears this hurdle, then the burden shifts back to the government to present a race-neutral explanation for striking

the juror in question. *Id.* at 97. Finally, assuming that the government presents a race-neutral reason for the challenge, the district court determines whether the defendant has demonstrated purposeful discrimination. *Id.* at 97-98. The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the [defendant]." *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

We review the district court's factual findings made under the *Batson* analysis by utilizing the clear-error standard. *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990). In particular, we give "great deference to the district court's findings on the credibility" of the prosecutor's race-neutral reasons. *Ferguson*, 23 F.3d at 141 (internal quotation marks omitted).

To establish a prima facie case of purposeful discrimination under *Batson*, the defendant must show the following: (1) that he or she is a member of a cognizable racial group, (2) that the prosecutor has exercised a peremptory challenge against a potential juror of the defendant's race, and (3) that these facts and any other relevant circumstances raise an inference that the prosecutor is purposefully discriminating based on race. *Id*. at 96. There is no dispute that Bevelle met factors (1) and (2) above. Whether Bevelle established a prima facie case turns on factor (3).

In the present case, the prosecutor exercised a peremptory challenge to exclude Ms. Jones, an African-American, from the jury. Jones revealed during voir dire that she had sat on a prior jury that had acquitted the defendant in a rape case. When the prosecutor asked her about her experience on that jury, she replied that "[t]here was too much reasonable doubt." She also had worked in the substance-abuse field for almost 20 years. Significantly, the prosecutor did not strike any of the other African-Americans on the jury.

Bevelle argued at voir dire that striking Jones amounted to purposeful discrimination because "I don't think there was any cause given in her answers to questions that had been asked that would give the Government any reason to dismiss her." But the district court found this argument unpersuasive in light of Jones's having served on a jury that acquitted another defendant and Jones's comments that the most salient part of her experience on that jury was that "[t]here was too much reasonable doubt." And the prosecutor stated that both of these grounds were among the reasons for striking Jones. The fact that other African-Americans were left on the jury further supports the district court's finding that the peremptory challenge to Jones was not based on racial discrimination. Because this factual finding is not clearly erroneous, Bevelle cannot get past the first step of *Batson*'s three-step framework.

**B.      Denial of Bevelle's motion for mistrial**

The other issue raised by Bevelle is whether the district court abused its discretion in denying Bevelle's motion for a mistrial and his motion for a new trial. This issue stems from a gratuitous comment made by Agent Wozniak in the presence of the Bevelle jury while he was being cross-examined by Rendon's counsel about the affidavits supporting the wiretap applications. During the cross-examination, Rendon's counsel asked Agent Wozniak whether he had received information from the Drug Enforcement Agency (DEA) or the Detroit Police Department (DPD) concerning Rendon. The following exchange occurred:

> Q.      (Interposing) Well, I want –
>
> A.      (Interposing) I thought you asked me a question if the Drug Enforcement Agency, if I received any [information] . . . from the Drug Enforcement Agency.

> Q. Paragraph 57? [referring to a paragraph of the affidavit]
>
> A. That was the question you asked me, correct?
>
> Q. No. Well I was asking about the DPD or DEA?
>
> A. And I'm referencing you now to paragraph 57 where it says: "On October 20th 2002 your affiant prepared a report prepared by FBI Detroit Investigative Research Specialist Robert Coloske concerning a 1992 US Drug Enforcement Administration investigation involving Christian Bevelle and Gail Bevelle [his wife]." I'm sorry, that was for Bevelle.

Bevelle's counsel objected to this comment at the next recess and moved for a mistrial the following day based on the theory that Agent Wozniak was a member of the prosecutor's team who had engaged in prosecutorial misconduct. Although the district court denied the motion, it did offer to issue a curative instruction. But Bevelle declined the offer. Bevelle also moved for a new trial on the same grounds, which the district court likewise denied. Bevelle argues on appeal that the court abused its discretion in denying these motions because the misconduct allegedly deprived him of a fair trial.

We review the denial of these motions under the abuse-of-discretion standard. *United States v. Hough*, 276 F.3d 884, 899 (6th Cir. 2002) (new-trial motion); *United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994) (mistrial motion). If we are firmly convinced that the district court "committed a clear error of judgment," then it is deemed to have abused its discretion. *Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641 F.3d 240, 245 (6th Cir. 2011) (internal quotation marks omitted); *see also Carroll*, 26 F.3d at 1383.

The first step in reviewing claims of prosecutorial misconduct is to determine whether the statements are improper. *United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997). If the

statements are improper, then we must determine if they are flagrant, which depends on the following

four factors:

> (1)    whether the remarks tended to mislead the jury or to prejudice the accused, including whether the trial judge gave an appropriate cautionary instruction to the jury;
>
> (2)    whether they were isolated or extensive;
>
> (3)    whether they were deliberately or accidentally placed before the jury; and
>
> (4)    the strength of the evidence against the accused.

*Id.* (brackets omitted). Nonflagrant comments warrant reversal only where "(1) the proof against the

defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district

court failed to give a curative instruction." *Id.* (internal quotation marks omitted). To deny a

defendant a fair trial, "prosecutorial misconduct must be so pronounced and persistent that it

permeates the entire atmosphere of the trial, or so gross as probably to prejudice the defendant."

*Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (citations and internal quotation marks

omitted).

Because the government concedes that Agent Wozniak's reference to Bevelle was improper,

we can limit our analysis to the issue of whether the statement was flagrant. Informing the jury that

a defendant currently on trial for conspiring to distribute drugs was involved in a previous, unrelated

DEA investigation would presumptively prejudice the defendant. Indeed, the prejudicial inference

is so commonplace that it is enshrined in the adage, "where there is smoke, there is fire." But the

comment by Agent Wozniak was isolated. And the trial judge would have given a cautionary

instruction to the jury except for the fact that Bevelle's attorney asked that the judge not give the instruction, presumably because the attorney did not want attention drawn to the stray comment.

The parties disputed below whether Agent Wozniak's comment was deliberate or unintentional, an issue that the district court did not clearly resolve. Regardless, the strength of the evidence against Bevelle weighs strongly in favor of finding that the statement was not flagrant. Broadnax testified that Bevelle supplied him with three ounces of cocaine to sell, and introduced him to Rendon as a supplier of larger drug quantities. He also said that Bevelle was involved in the drug conspiracy by advising Broadnax on how to respond to customer complaints, by supplying Broadnax with customers, and by accepting proceeds from cocaine sales. In an interview with Agent Wozniak, Bevelle himself admitted that he had introduced Broadnax to Rendon in order to connect Broadnax with someone who could supply Broadnax with cocaine. Bevelle also admitted knowing that Broadnax thereafter obtained progressively larger amounts of cocaine from Rendon, which Broadnax then resold.

On balance, the factors set forth in *Monus* weigh in favor of concluding that the stray comment from Agent Wozniak was not flagrant. And the nonflagrant comment did not deny Bevelle a fair trial because the evidence against him was strong, the comment was isolated, and the district court would have given a curative instruction but for the fact that Bevelle's attorney demurred. The district court therefore did not abuse its discretion in concluding that the comment did not warrant reversal.

**C.      Dual-role instruction for Agent Wozniak's expert and fact testimony**

We now turn to the three issues raised on appeal by Rendon.  His first issue is whether the district court committed plain error by failing to give an instruction to the Rendon jury delineating Agent Wozniak's dual role as a fact and expert witness.

During the trial, Agent Wozniak was called by the government to testify as a fact witness at the start of the case.  But the government conceded at oral argument that some of Agent Wozniak's testimony when he first testified was expert in nature.  Later, the government recalled Agent Wozniak to the stand as an expert witness at the end of its case in chief.  This testimony of Agent Wozniak was preceded by (1) the government's statement that "[t]he Government is going to call Agent Richard Wozniak to testify as an expert in the area of cocaine conspiracy investigations and the meaning of certain terms used in some of the intercepted telephone calls," and (2) the district court's instruction that

> [a]n expert witness has unique knowledge or experience that allows the witness to
> give an opinion.  You do not have to accept an expert's opinion.  In deciding how
> much weight to give it, you should consider the witness's knowledge, qualifications
> and how he reached his conclusions.  Remember that you alone decide how much of
> a witness's testimony to believe and how much weight it deserves.

The district court gave the jury a materially identical expert-witness instruction at the close of trial.  And the district court's general-witness instructions given at the start and end of trial let the jury know that they were free to disregard the testimony of fact witnesses based on the jury's credibility assessments.  But no instruction was given that explicitly informed the jury of Agent Wozniak's dual role as a fact and expert witness.  On the other hand, Rendon did not object to Agent

10

Wozniak's testifying as both a fact and expert witness or to the district court's instructions regarding either Agent Wozniak's testimony specifically or regarding fact and expert witnesses generally.

This court has held that "it is an error to permit a witness to testify both as a fact witness and as an expert witness unless there is a 'cautionary jury instruction regarding the witness's dual witness roles' or 'a clear demarcation between the witness's fact testimony and expert opinion testimony.'" *United States v. Smith*, 601 F.3d 530, 540 (6th Cir. 2010) (quoting *United States v. Lopez-Medina*, 461 F.3d 724, 745 (6th Cir. 2006)). But because Rendon did not object to the lack of a dual-role instruction, he cannot prevail on this issue unless he shows that any error was "plain." *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) (holding that district court rulings that are not objected to are reviewed under the plain-error standard).

To prevail under the plain-error standard, Rendon must show, among other things, that the alleged error "affected substantial rights." *Smith*, 601 F.3d at 541 (internal quotation marks omitted). This requires Rendon to "show that the error was prejudicial, that is, that it affected the outcome of the district court proceedings." *Id.* One of Rendon's arguments at trial was that he had not sold cocaine at all, but rather marijuana. Rendon contends that he has shown prejudice because the failure of the district court to give a dual-rule instruction deprived him of a "fair trial on the issue of whether he had been selling marijuana instead of cocaine." But Broadnax testified that Rendon repeatedly sold him cocaine to distribute, and this testimony independently supports the verdict even if Agent Wozniak's testimony is not considered. In light of this independent evidence, Rendon cannot show that the result of his trial would likely have been different in the absence of the alleged error.

**D.      Alleged *Miranda* violation**

The next issue raised by Rendon is whether the statements that he made to investigators while being interviewed on his front porch were given in violation of *Miranda* and should therefore be suppressed.  But Rendon acknowledges that he did not make this argument in a pretrial motion to suppress as required by Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, and that he instead is raising it for the first time on appeal.

This court has held that it is without jurisdiction to consider suppression issues not timely raised. *United States v. Yannott*, 42 F.3d 999, 1005 (6th Cir. 1994).  But we may "address such issues in exceptional circumstances or where application of the rule would result in a plain miscarriage of justice."  *United States v. Poole*, 407 F.3d 767, 773 (6th Cir. 2005) (internal quotation marks omitted).  That exception, however, is inapplicable here because Rendon was never questioned while in custody, which he must have been to be entitled to *Miranda* warnings.  *See Miranda v. Arizona*, 384 U.S. 436, 477 (1966) (holding that the *Miranda* warnings are required only during custodial interrogation).

The government agents expressly told Rendon that he was not under arrest when they interviewed him at his own home, and the home environment in itself is obviously not hostile or coercive.  *See United States v. Salvo*, 133 F.3d 943, 950-51 (6th Cir. 1998) (observing that several circuit courts "have found that when police question a suspect in a residence, these circumstances often do not rise to the kind of custodial situation that necessitates *Miranda* warnings, whether they are free to leave or not").  Rendon has therefore waived this issue by failing to assert it in a pretrial motion to suppress.

**E.      Burden of proof for forfeiture judgment**

The final issue raised by Rendon is whether the burden of proof for the forfeiture judgment

was shifted improperly from the government to Rendon.  Because Rendon did not object on this basis

during the forfeiture proceeding, we will analyze the issue under the plain-error standard of review.

*Puckett*, 129 S. Ct. at 1429.

Under 21 U.S.C. § 853(a)(1), a person convicted under federal law of committing a felony

drug offense must forfeit to the United States any direct or indirect proceeds obtained from drug

trafficking.  For property to be subject to forfeiture, the government must prove by a preponderance

of the evidence that the property is the proceeds of the drug violation.  *United States v. Smith*, 966

F.2d 1045, 1052 (6th Cir. 1992).  Where the government is unable to recover the actual property that

is subject to forfeiture, the government can seek a money judgment against the defendant for an

amount equal to the value of the property that constitutes the proceeds of the drug violation.  21

U.S.C. § 853(p).

Rule 32.2 of the Federal Rules of Criminal Procedure governs the procedure of a criminal-

forfeiture hearing.  The rule allows the factfinder's determination to be based on evidence already in

the record and on any additional evidence submitted by the parties.  Fed. R. Crim. P. 32.2(b)(1)(B).

Where a jury determines forfeiture, the "government must submit a proposed Special Verdict Form

listing each property subject to forfeiture and asking the jury to determine whether the government

has established the requisite nexus between the property and the offense committed by the defendant."

Fed. R. Crim. P. 32.2(b)(5)(B).

13

Rendon's argument that the government's use of a special verdict form improperly shifted the burden of proof is meritless because Rule 32.2 requires the use this form in precisely the way that it was used. The form listed the property that the government asserted was subject to forfeiture (i.e., $600,000), and the jury had to determine whether the government had proven the nexus between that $600,000 and Rendon's drug-trafficking violation. The burden was not improperly shifted to Rendon to prove that the $600,000 was unrelated to the drugs.

Rendon's further argument that the government's forfeiture case was based solely on the unsubstantiated speculation of Agent Wozniak is belied by the record. Broadnax's testimony supported using a conservative $20,000 value for a kilogram of cocaine based on his statement that he paid $21,000 for each kilogram of cocaine acquired from Rendon, which he then resold for $22,000. His testimony further supports a finding that Rendon had sold Broadnax at least 30 kilograms of cocaine.

Moreover, Broadnax testified that Rendon sold him five kilograms three times, three kilograms three or four times, two kilograms at least once, one kilogram several times, a half a kilogram once, and an eighth of a kilogram three times. Adding these numbers up by using the most conservative estimate (i.e. assuming that he purchased three-kilogram quantities only three times, two-kilogram quantities only once, and one-kilogram thrice) produces an approximate sum of at least 30 kilograms, with the likelihood that Rendon sold substantially more based on all of the instances that he did not specifically recall. A figure of $600,000 based on an estimate of 30 kilograms at $20,000 per kilogram is thus adequately supported by the record.

### III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.