RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0235P (6th Cir.)
File Name: 03a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――

WILLIAM G. ZUERN,
*Petitioner-Appellee/*
*Cross-Appellant,*

*v.*

ARTHUR TATE, Warden,
*Respondent-Appellant/*
*Cross-Appellee.*

Nos. 00-3526/3543

―――――――――

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 92-00771—Walter H. Rice, Chief District Judge.

Argued: February 4, 2003

Decided and Filed: July 17, 2003

Before: BOGGS, NORRIS, and SILER, Circuit Judges.

―――――――――

## COUNSEL

**ARGUED:** Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellant. Lawrence J. Greger, Dayton,

Ohio, for Appellee. **ON BRIEF:** Charles L. Wille, Timothy D. Prichard, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellant. Lawrence J. Greger, Dayton, Ohio, Kathleen A. McGarry. Glorieta, New Mexico, for Appellee.

―――――――――

## OPINION

―――――――――

SILER, Circuit Judge. Arthur Tate, Warden, appeals the district court's grant of a writ of habeas corpus to Petitioner William G. Zuern on the basis of a *Brady* violation. Zuern appeals the district court's denial of habeas corpus based on his claims of insufficiency of the evidence, prejudicial conduct by a witness, and juror misconduct. For the reasons stated below, we **REVERSE** the district court's grant of habeas corpus on the basis of the *Brady* violation, and we **AFFIRM** the denial of habeas corpus on all other claims.

## I.

On May 14, 1984, Zuern was incarcerated at the Community Correctional Institute ("CCI") in Hamilton County, Ohio. In the latter part of May 1984, Zuern had a conversation with inmate Wayne C. Lewis about the fact that corrections officers failed to give Zuern his full five minutes of telephone time. During the conversation, Zuern expressed general hostility to the officers, saying that "[s]omebody should do something to them sons of bitches." Lewis also had observed Zuern sharpening a straightened portion of a metal bucket hook over the course of three days. Lewis informed a corrections officer that Zuern had a knife or a shank.

On June 9, 1984, inmate Loyal Hearst informed Deputy Kenneth Schweinefuss that Hearst and Zuern had argued the day before and that Zuern stated he was going to kill Hearst.

Hearst also said that Zuern had a homemade knife which he had sharpened on his cell floor. Schweinefuss recorded this information in a memorandum. That evening, officers were ordered to search Zuern's cell, among others. Before the officers arrived at Zuern's cell, Zuern received a tip from another inmate that the officers were coming to search his cell.

At approximately 10:20 p.m., Officers Joe Burton and Phillip Pence arrived to perform the search and found Zuern lying naked in his bunk. Officer Pence ordered Zuern to get to his feet. Zuern then stood at the door of the cell. Pence unlocked the cell and told Zuern to come out and put his hands against the wall. Zuern lunged at Pence, fatally stabbing him in the chest with the metal shank. The weapon was a long dagger-like piece of metal, approximately seven inches long. One end was sharpened to a point, and the other was curved into a loop.

## II.

Zuern was indicted for purposely causing the death of another with prior calculation and design in violation of Ohio Revised Code § 2903.01. A jury found Zuern guilty of aggravated murder and recommended a death sentence; the trial judge sentenced Zuern to death. For our purposes, three noteworthy events occurred at trial: (1) the prosecution failed to turn over the memorandum from Schweinefuss; (2) while testifying for the prosecution, Lewis improperly blurted out "[Zuern] is in here for murder, and he won't hesitate to do it again"; and (3) a juror overheard a television broadcast about Zuern's case.

In 1986, the Ohio Court of Appeals affirmed Zuern's conviction and sentence. Later, the Supreme Court of Ohio also affirmed. *Ohio v. Zuern*, 512 N.E.2d 585 (1987).

Zuern's state court collateral appeals were likewise unsuccessful: the Court of Common Pleas dismissed his

request for relief without affording him an evidentiary hearing; the Ohio Court of Appeals affirmed the dismissal in *State v. Zuern*, Nos. C- 900481, C- 910229, 1991 WL 256497 (Ohio App. December 4, 1991); the Ohio Supreme Court denied his request for further review.

Zuern then sought federal habeas corpus relief, asserting 25 separate grounds or claims for relief. The magistrate judge recommended finding that Lewis's prejudicial statement mandated a writ of habeas corpus. The district court disagreed, but found instead that the failure to turn over the Schweinefuss memorandum (an alleged *Brady* violation) mandated a writ.

## III.

Zuern filed his petition before the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). Under pre-AEDPA analysis, "this court reviews a district court's refusal to grant a writ of habeas corpus *de novo*, but reviews the district court's factual findings for clear error." *Coe v. Bell*, 209 F.3d 815, 823 n.2 (6th Cir. 2002).

## IV.

### A.   Sufficiency of the Evidence

Zuern was convicted of aggravated murder, which under Ohio Revised Code § 2903.01 (A) requires a finding of prior calculation and design. In the second habeas claim, Zuern argues that the facts presented at trial are insufficient to prove beyond a reasonable doubt that he acted with prior calculation

and design.[1]  The relevant jury instructions, to which neither party objected, are as follows:

> Prior calculation and design means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the instrument with which to cause the death of another.
>
> To constitute prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.
>
> It is not necessary that the defendant have a plan to kill a specific individual. Prior calculation and design exists where the defendant plans to kill any member of a certain class of persons, even if he did not know in advance who the particular victim would be. Prior calculation and design in such a situation may be found to exist if the totality of circumstances show a prior calculation and design to kill a member of a certain group.

---

[1]In the first habeas claim, Zuern argues that newly discovered evidence (specifically, subsequent testimony from Lewis and the Schweinefuss memorandum and deposition) establishes that he did not act with prior calculation and design. The Supreme Court has held that newly discovered evidence does not constitute a freestanding ground for federal habeas relief, but rather that the newly discovered evidence can only be reviewed as it relates to an "independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Therefore, Zuern's first habeas claim is best resolved by our decision on the alleged *Brady* violation (discussed below).

In reviewing the sufficiency of the evidence to support a criminal conviction, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

No one disputes the fact that the Zuern killed Pence. The only contested issue on this claim is whether Zuern acted with the "prior calculation and design" needed for an aggravated murder conviction. At trial, the jury heard evidence that (1) eleven days before the stabbing, Zuern expressed general hostility toward corrections officers, (2) Zuern had advance notice of the weapons search, (3) instead of hiding the shank or getting rid of it, Zuern kept the shank ready at hand knowing that the search was coming, and (4) when the officers arrived at Zuern's cell, he initially complied with their order to stand in front of the cell door, lunging at Pence only after the cell door had been opened.

*State v. Reed*, 418 N.E.2d 1359 (Ohio 1981), presented a similar situation. In *Reed*, the defendant shot and killed a police officer who had stopped his car to investigate a botched robbery. Other than the evidence regarding the shooting itself, the only evidence of prior calculation and design was a statement Reed made to a classmate approximately a month before the shooting that "if a cop got in his way (during a robbery) he would blow him away." *Id.* at 1361.

The Ohio Supreme Court reversed the conviction, finding insufficient evidence of prior calculation and design:

> In the case at bar, the evidence regarding the killing at most indicates the presence of instantaneous deliberation. The statements appellant made to a classmate that he would kill any police officer who got in the way of a crime he might commit do not show that appellant designed a scheme in order to implement a calculated

decision to kill. Not only were the remarks significantly removed from the killing in terms of a time frame but they were very general in nature and thus were not relevant to the killing of [the officer].

*Id.* at 1362-63.

Both Reed's and Zuern's statements were made a significant time before the killing. If anything, Zuern's statement is less inculpatory than Reed's, as Zuern's statement that "[s]omebody should do something to them sons of bitches" does not indicate an intent to kill or predict a specific situation or killing method. In Zuern's case, the jury heard specific evidence that immediately before the killing, Zuern received a warning that officers were coming to his cell. However, in *Reed*, the jury heard evidence that Reed was pulled over immediately before the killing (giving him time to contemplate what to do when the officers arrived).

The one important difference between *Reed* and Zuern is that in Zuern's case, the jury heard evidence of Zuern's deliberate and prolonged creation of a murder weapon. Viewing the evidence in the light most favorable to the prosecution, the jury could have found that Zuern created the murder weapon in order to kill an officer.[2] Given this evidence, a rational jury could find beyond a reasonable doubt that in killing Pence, Zuern acted with prior calculation and design.

## B. Brady Violation

At trial, in explaining the justification for the search of Zuern's cell, Schweinefuss testified that an inmate had told him that Zuern had a knife. However, the inmate's identity and the contents of Schweinefuss's memorandum were not

---

[2]Indeed, because Zuern did not raise the defense of "I planned to kill Hearst," the jury's only reasonable inference is that Zuern created the weapon to kill a corrections officer.

disclosed to the defense. The memorandum included the following:

[On June 9, 1984] Inmate Loyal Hearst called me to his cell and stated that he and William Zuern had an argument on 6-8-84 and that Zuern stated he was going to kill him the first chance he got. The inmate Hearst also stated that Zuern had in his possession a homemade knife which he had sharpened on his cell floor.

The Sixth Circuit recently discussed the standard for reviewing alleged *Brady* violations:

Pursuant to the rule enunciated in *Brady v. Maryland*, the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. *See United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994).

When the defendant, as in this case, asserts that the newly discovered *Brady* evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the favorable evidence at issue was "material." *United States v. Frost*, 125 F.3d 346, 382 (6th Cir.1997). In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court clarified the "materiality" analysis. The Court explained that a showing of materiality does not require that the suppressed evidence in question establish the defendant's innocence by a preponderance of the evidence. Rather, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555; *Frost*, 125 F.3d at 382-83 (6th Cir.1997). Nor does the defendant need to "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434-35, 115 S.Ct. 1555; *United States v. Smith*,

77 F.3d 511, 515 (D.C.Cir.1996) (materiality requirement is not a sufficiency-of-the-evidence test).

Instead, any favorable evidence, regardless of whether the defendant has made a request for such evidence, is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34, 115 S.Ct. 1555 (*quoting United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *Frost*, 125 F.3d at 382. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375; *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir.1988).

*Schledwitz v. United States*, 169 F.3d 1003 (6th Cir. 1999).

Our analysis must focus on the contents of the memorandum not already known by Zuern. Although Zuern presumably knew that he had threatened Hearst's life, Zuern did not know that Hearst had notified Schweinefuss or that Schweinefuss had written a memo documenting the death threat.

Zuern argues that, with the memo, he could with greater confidence pursue the defense of "I planned to kill Hearst, not a corrections officer." Specifically, he argues that memo would have given him greater certainty that he could prove his death threat to Hearst through credible testimony from Hearst and/or Schweinefuss.

In order to reject the *Brady* claim, we must find either that (1) the memorandum would not have helped Zuern prove that he planned to kill Hearst, or (2) even if Zuern had convinced the jury that he planned to kill Hearst, he would still have been found guilty. We find that even assuming the memorandum would have helped Zuern prove that he planned to kill Hearst, nevertheless he would have been found guilty because the jury would still have found that he had planned to

kill a corrections officer. The prosecution's theory (Zuern planned to kill a corrections officer) and Zuern's proposed theory (Zuern planned to kill Hearst) are not mutually exclusive, as Zuern could have planned to kill both.

After hearing evidence of Zuern's deliberate and prolonged creation of a murder weapon, the jury certainly could find that Zuern acted with prior calculation and design to kill someone. The jury apparently concluded that this "someone" was a corrections officer. Indeed, as Zuern did not pursue the "I planned to kill Hearst" theory, this conclusion was the jury's only reasonable alternative. However, presentation of the alternative would not affect the result. Specifically, even if Zuern had used the memo to persuade the jury that he planned to kill Hearst, we do not believe there is a reasonable probability that the jury would have found that Zuern had not planned to kill a corrections officer.

## C.   Witness Lewis's Prejudicial Statement

During the direct examination of Lewis, the prosecutor questioned him about a conversation he had with Officer Ron Doyle a matter of hours before Zuern killed Pence:

Question:     What did you tell Officer Doyle?

Answer:       I told Officer Doyle, "Officer Doyle, can we talk, could we rap? I'm telling you, you know, Zuern has a shank or a knife or whatever you want to call it." I said, "He is crazy, man, he is in here for murder, and he won't hesitate to do it again."

At that point, Petitioner's counsel moved for a mistrial, which the court denied. The court did, however, instruct the jury to disregard Lewis's comment:

The Court:    Members of the jury, you are admonished at this time that any testimony just offered

was a gratuitous remark by the witness, and is excluded from your consideration as any part of the evidence in this matter.

The dispute here is not over the propriety of Lewis's comments (which everyone agrees were improper), but rather over the appropriate remedy. When reviewing the trial decision of a federal district court, the standard of review for a decision not to grant a mistrial is abuse of discretion. *United States v. Chambers,* 944 F.2d 1253, 1263 (6th Cir. 1991). When conducting habeas review of a trial decision of a state court not touching on a specific provision of the Bill of Rights, the standard of review is even higher: reversal is not warranted unless the comment "was potentially so misleading and prejudicial that it deprived [the defendant] of a constitutionally fair trial." *Donnelly v. DeChristoforo*, 416 U.S. 637, 641-42 (1974) (noting that "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice'"). Specifically, habeas review of this state decision involves "the narrow [review] of due process, and not the broad exercise of supervisory power that [a federal appellate court] would possess in regard to (its) own trial court." *Id.*

Given this standard of review, we turn to the question of whether a mistrial should have been granted. In *United States v. Forrest*, 17 F.3d 916 (6th Cir. 1994), we listed five factors to consider in determining whether a mistrial is warranted after an improper reference: (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant. *Id.* at 920.

In *Forrest*, the trial judge specifically directed the prosecutor to warn a witness (an ATF agent) not to testify to

Forrest's criminal past. *Id.* Nonetheless, the agent twice referenced the fact that Forrest had been imprisoned for robbery. *Id.* We found that "the agents 'blurting' seem[ed] anything but accidental," but that the trial judge had given a clear admonition and the prosecution had offered ample other evidence of guilt. *Id.* at 921. Although noting that it was a "close question" we found no abuse of discretion in the district court's failure to grant a mistrial. *Id.* That case was decided in the stricter supervisory capacity of direct review, not in a habeas corpus petition.

In Zuern's case, the first four *Forrest* factors weigh in favor of the Warden (the remark was unsolicited, the line of questioning reasonable, the limiting instruction immediate and clear, and evidence of bad faith is absent). *Forrest* involved an improper statement about a robbery conviction in the context of a cocaine distribution trial. Zuern's case involves an improper statement about a prior murder in the context of a murder trial. The prejudice faced by Zuern is greater than that faced by Forrest. Not only is murder a much more heinous crime than robbery, but the inappropriate propensity evidence is of far greater weight (compare "a robber is likely to distribute cocaine" with "a murderer is likely to commit murder"). Nevertheless, the failure to grant a mistrial did not constitute a denial of fundamental fairness.

## D.   Failure to Excuse Juror Taylor

In the morning before the first day of the trial on which evidence was presented, Juror Beulah Taylor overheard a television broadcast about Zuern's trial. Specifically, she overheard "a version of what had happened, why [Zuern] was in [jail] in the first place,[and] that he had been there previous[ly]." Taylor told the court that she could be fair, but would rather not serve. Zuern's counsel did not immediately request that she be removed, but the following morning, after viewing the broadcast at issue, he moved for a mistrial, or, in the alternative, to remove Taylor from the jury. Taylor was brought before the court a second time, and she again

indicated that she could be fair. The trial court declined either to excuse Taylor or to declare a mistrial.

When reviewing a federal district court's actions in a case of alleged juror misconduct, this court reviews for abuse of discretion under all the circumstances. *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985). Again, as we are conducting habeas review of a state decision, we must focus on "the narrow [review] of due process, and not the broad exercise of supervisory power that [a federal appellate court] would possess in regard to (its) own trial court." *Donnelly*, 416 U.S. at 641-42.

In *United States v. Rugiero*, 20 F.3d 1387 (6th Cir. 1994), we listed four points to consider in cases of possible improper juror contact: "(1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the '*Remmer* hearing' is not inherently suspect." *Id.* at 1390. Both the Ohio Supreme Court and the federal magistrate judge in this case found that Zuern had waived the claim for juror misconduct, as Zuern's counsel did not request Taylor's removal after the first hearing on the issue. However, the trial court allowed Zuern's counsel to raise the juror misconduct objection the next day, and ruled on the merits that Taylor would remain on the jury. Reaching the merits, we find no jury misconduct error warranting reversal. The trial court properly held a *Remmer* hearing, and concluded – based on Taylor's assurances – that she could serve as a fair and impartial juror. Zuern has not met his burden of proving actual juror bias.

## V.

In sum, we find that (1) sufficient evidence supports the jury finding of aggravated murder, (2) had the Schweinefuss memorandum been disclosed to the defense, there is not a

reasonable probability that the result of the proceeding would have been different, (3) the failure to grant a mistrial after Lewis's prejudicial statement did not constitute a denial of fundamental fairness, and (4) the failure to excuse Juror Taylor after she saw a television broadcast about Zuern's case did not constitute a denial of fundamental fairness.

Accordingly, we **REVERSE** the district court's grant of habeas corpus on the basis of the *Brady* violation, and we **AFFIRM** the denial of habeas corpus on all other claims.