NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0025n.06

Case Nos. 09-5518, 09-5894

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | **Jan 10, 2012** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| JAMES ALEXANDER, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| Defendant-Appellant (09-5518), | ) | DISTRICT OF TENNESSEE |
| | ) | |
| JEFFREY ODOM, | ) | |
| | ) | |
| Defendant-Appellant (09-5894). | ) | |
| | ) | |
| _____ | ) | |

BEFORE: BATCHELDER, Chief Judge; BOGGS and WHITE, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge. James Alexander and Jeffrey Odom were each found to be in possession of a firearm during a traffic stop by the Murfreesboro Police; they were each charged with being a felon in possession of a firearm. The district court denied their Motions to Suppress except with respect to one aspect of Odom's motion. Alexander conditionally pled guilty, preserving his right to appeal the suppression issue. Odom went to trial and was convicted by a jury. They both appeal the denial of their Motions to Suppress, and Odom appeals several other aspects of his trial and sentence. For the following reasons, we affirm the district court.

I.

The relevant facts of this case are not disputed. On March 21, 2007, Murfreesboro Police Officer Jacoby O'Gwynn was patrolling in his squad car within the city of Murfreesboro. At

approximately 9:28 p.m., Officer O'Gwynn saw a blue Chevy Lumina driving on University Street. The car did not have a functioning light illuminating the rear license plate (a "tag light").

Believing that a local ordinance required license plates to be illuminated by a tag light,[1] O'Gwynn activated his flashing blue lights and pulled the car over. As O'Gwynn approached the driver's side door, he saw Latrice Johnson in the driver's seat, and three passengers in the car. Jeffrey Odom (Johnson's boyfriend at the time) was sitting in the front passenger's seat. Millie Gaines (Johnson's half sister) and James Alexander were sitting in the back seat. O'Gwynn told Johnson that he had pulled her over for not having a visible tag light, and O'Gwynn asked for Johnson's license, registration, and proof of insurance. She promptly complied. O'Gwynn asked Johnson if she had any guns, knives, drugs, or other contraband, to which she replied, "No."

O'Gwynn asked the three other passengers for identification. Odom, the front-seat passenger, complied and produced a state probation card. Alexander and Gaines, rear-seat passengers, stated that they did not have any identification. O'Gwynn asked each for his or her name, date of birth, and social security number. Mr. Alexander gave the name "Deran Albert," a date of birth, and a social security number. Ms. Gaines gave the name "Terry Harris," a date of birth, and a social security number. Instructing the occupants to wait in the car, O'Gwynn returned to his squad car to check the information they had given him.

---

[1] There is no Tennessee state law requiring a tag light. The local ordinance, Murfreesboro Code § 32-1005(c) provides:

> Either a tail lamp or separate lamps shall be so constructed and placed to illuminate with a white light the rear registration plate and render it clearly legible from fifty (50) feet to the rear. Any tail lamp or tail lamps, together with any separate lamp or lamps for illuminating the rear registration plate, shall be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted.

At this point, Officer Harry Haigh arrived to provide backup. Haigh remained standing outside the Lumina, keeping watch while O'Gwynn ran the information.

Johnson's license and registration were valid, and the name "Terry Harris" corresponded to the social security number Gaines had given (even though it was later learned that Gaines had given false information). However, the social security number that Alexander had given matched that of a female. O'Gwynn returned to the Lumina with this information while Officer Haigh used the computer in O'Gwynn's car to check for more information on Alexander. O'Gwynn asked Alexander to step out of the car, and asked him if he had any guns, knives, or drugs on his person, to which Alexander replied, "No." O'Gwynn asked if Alexander would mind if he patted him down, to which Alexander replied, "No." During the pat down, O'Gwynn discovered a loaded .357 Ruger revolver in Alexander's waistband, and called to Haigh that he had found a firearm. Haigh ordered the other occupants to show their hands. He also called for backup.

Within a minute or two, at least four other squad cars arrived to assist. An officer handcuffed Alexander, and O'Gwynn arrested him, read him his Miranda rights, and placed him in the backseat of his squad car. The officers ordered the three remaining occupants out of the car. They handcuffed the two women and read them their Miranda rights. Officer Haigh removed Odom from the vehicle, handcuffed him, and patted him down. He found no weapons. Haigh then searched the car and found nothing, but he could not access the locked glove compartment. Haigh could not find the key to the glovebox on Johnson's key ring, but he reached into Odom's pants pocket and found the key

there.[2] Inside the glove compartment, Haigh found a loaded 9-mm semi-automatic handgun and a knit stocking cap. The gun had an obliterated serial number. Johnson claimed that the firearm was hers, and Odom denied that it was his.

All four occupants of the vehicle were taken to the police station for questioning. At the station, Alexander was finally identified correctly. The officers found that there was an active warrant for his arrest for a parole violation, and Officer O'Gwynn again read Alexander his Miranda rights. Alexander waived his Miranda rights in writing, and stated that he had purchased the .357 revolver on the street for protection.

Johnson was read her Miranda rights again at the station. She waived her rights in writing, and admitted that the gun in the glove compartment belonged to Odom and that she had lied earlier to protect him.

The police then interviewed Odom, who had been placed in an interview room where he had waited alone for some 10 minutes, his left arm handcuffed to the table. Detective Merrill Beene, in plainclothes, and Officers O'Gwynn and Haigh, in uniform, entered the interview room. All three wore sidearms, but did not brandish the weapons at any time. Detective Beene, who knew Odom, read Odom his Miranda rights; Odom waived those rights in writing.

The interview lasted about 20 minutes, with Beene doing most of the questioning. Odom was animated and argued back and forth with the officers. Odom was asked essentially the same questions over and over again, and his responses kept changing. Eventually, after being told that

---

[2]The district court held that this search and the seizure of the key was unconstitutional. The government does not contest that point.

Johnson had already stated that the gun belonged to Odom, Odom admitted that the gun was his and that he had placed it in the glovebox. He stated that he had purchased the gun for his protection, even though he knew he was a convicted felon. During the interview, Odom never requested a break, food, drink, medication, or any special attention.

In addition to other offenses, Alexander and Odom were each charged with being a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1) & 924. Both Alexander and Odom moved to suppress nearly all the evidence, including the guns and their confessions. After holding an evidentiary hearing on June 20, 2008, the district court denied their motions almost entirely, except with respect to the glovebox key found on Odom's person. The court held that the discovery of the key was the result of an illegal search, since officers at that point would have been justified only in searching Odom for weapons to ensure the officers' safety. However, the court also held that the discovery of the gun in the glovebox was inevitable, because the officers would have used tools to gain access to the glovebox had they not found the key. While evidence of Odom's possession of the key was not allowed at trial, the fruits of the illegal search—the firearm and the hat—were allowed.

Alexander conditionally pled guilty, reserving the suppression issue for appeal. He was sentenced to a term of 84 months of imprisonment, followed by 3 years of supervised release.

Odom went to trial before a jury. At trial, over Odom's objection, the court permitted Latrice Johnson's prior testimony from the suppression hearing to be entered into evidence by the prosecution, because the prosecution was not able to secure her presence at trial. Also at trial, Odom

moved for a mistrial when Officer O'Gwynn stated during redirect, "there's some things I can't say."[3] The court ruled that such a statement was not so unfairly prejudicial as to warrant a mistrial.

Odom was convicted by a jury. At sentencing, the court found Odom's base offense level to be 24, because he had two or more felony convictions for crimes of violence or controlled-substance offenses. The court increased his offense level by 4 levels to 28 because the firearm he possessed had an obliterated serial number. The court then increased his offense level by 5, taking it to 33, because he was an armed career criminal under the Armed Career Criminal Act. That resulted in a guidelines range of 235 to 293 months. The court sentenced Odom to 210 months of imprisonment, followed by 5 years of supervised release.

Both Alexander and Odom filed timely appeals.

## II.

## A.

First, on the suppression issue, Alexander challenges only the validity of the initial traffic stop. Odom challenges the validity of the traffic stop with only one cursory argument.[4] Odom then goes on to challenge other aspects of the traffic stop and searches.

---

[3]Presumably, Officer O'Gwynn was referring to the glovebox key, evidence regarding which was suppressed.

[4]In his reply brief, Odom attempted to join in all of Alexander's arguments, but "[w]e have consistently held . . . that arguments made to us for the first time in a reply brief are waived." *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010).

In reviewing a district court's denial of a motion to suppress, this court reviews the district court's legal conclusions de novo. *United States v. Garcia*, 496 F.3d 495, 502 (6th Cir. 2007). We review factual findings only for clear error. *Id.*

**1.**

Alexander begins by claiming that the traffic stop itself was invalid, because Officer O'Gwynn did not have reasonable suspicion that a law was being violated to warrant his stop of the vehicle. Alexander claims that (1) the district court erred in recognizing the Murfreesboro tag light ordinance because the government did not "prove" the law existed; (2) the tag light ordinance, if it did exist, was invalid due to state law; and (3) if the ordinance was indeed invalid, the officer could not have acted in good-faith reliance on it.

There is some confusion in this circuit over whether officers must have reasonable suspicion or probable cause in order to initiate a traffic stop. *See United States v. Simpson*, 520 F.3d 531, 538–41 (6th Cir. 2008). Despite the virtual unanimity on the issue in other circuits, *see id.* at 540–41 (collecting cases), various cases in this circuit have suggested that there is a difference when the suspected violation is momentary rather than ongoing, or civil instead of criminal. *See United States v. Hughes*, 606 F.3d 311, 316 n.8 (6th Cir. 2010); *Simpson*, 520 F.3d at 538–41. This conflict need not concern us here because, regardless of the standard, there was probable cause to believe there was an ongoing traffic violation. Here, Officer O'Gwynn had probable cause to believe that Ms. Johnson was driving the Lumina in violation of Murfreesboro Code § 32-1005(c), which required every car to have a tag light illuminating the license plate so that it is legible from a distance of at least 50 feet.

Alexander claims that the district court erred because it did not require the government to prove the existence of the Murfreesboro ordinance. At trial, Officer O'Gwynn testified as to the existence of the ordinance, and the government introduced an uncertified, unauthenticated copy of the ordinance, but only for identification purposes. Alexander claims that unlike state and federal law, local and municipal law must be proven by the government.

Alexander's argument fails. The district court itself properly determined what the municipal ordinance itself required, and did not require the prosecution to prove it. While some older decisions from other jurisdictions indicate that local and municipal law must be proven by the relevant party, most circuits seem to have abandoned that requirement. As this court has stated, the prosecution's duty is to prove facts, not law. *United States v. Wynn*, 987 F.2d 354, 358 (6th Cir. 1993) ("Our judicial system requires the prosecution to prove facts, not laws."). Judges determine what the law is. *Id.* Most circuits that have spoken on the issue confirm that this principle applies to local and municipal law. *See Tollis, Inc. v. Cnty. of San Diego*, 505 F.3d 935, 938 n.1 (9th Cir. 2007) ("Municipal ordinances are proper subjects for judicial notice."); *Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002) (same); *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1503–04 (10th Cir. 1997) (same).[5] While our sister circuits use the language "judicial notice," in this circuit we have a slightly more refined understanding of that term. In this circuit, judicial notice refers to

[5]However, the First Circuit has held otherwise, stating that municipal ordinances and private codes referred to in statutes are not typically the subject of judicial notice. *See Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 320 (1st Cir. 2004). But the *Getty Petroleum* court was specifically addressing a situation where a party had failed to produce any copy whatsoever of a private, non-governmental code of safety standards from the National Fire Protection Association from the relevant year. *Id.* at 316–17. That case did not involve a municipal ordinance.

the noticing of facts alone; when it comes to law, judges "find" or "determine" the law. As we explained in *United States v. Dedman*, 527 F.3d 577, 587 (6th Cir. 2008): "In several modern opinions, we have cabined the concept of 'judicial notice' to facts alone. The effect of such a semantic move is largely minimal because judges are still entitled—and indeed required—to determine the applicable law . . . . The semantic adjustment is . . . of little consequence . . . ." This circuit has never adopted the sort of rule that Alexander suggests.

Here, the district court correctly carried out its duty in determining what the law was. A copy of the municipal ordinance—albeit unauthenticated—was read into the record. Alexander never claimed that it had been repealed. The district court did not err in determining that Murfreesboro had the tag-light ordinance.

Alexander next argues that even if the ordinance did exist, it was invalid because it conflicted with state law. We note that it is possible that the Murfreesboro ordinance is invalid under state law. State law expressly does not require a tag light for single motor vehicles. *See* Tenn Code Ann. § 55-9-404(b).[6] While the Tennessee Code empowers municipalities to enact and enforce additional regulations with regard to operation of vehicles, *see* Tenn. Code Ann. §§ 55-10-307; § 55-10-308,

---

[6]The history of state laws requiring tag lights is worth noting. An old version of Tennessee Code § 55-9-404 required tag lights on the end of trailers, but could arguably have been interpreted to also require tag lights on all single vehicles. *See* 1989 Pub. Acts, c. 591, § 113. The court in *State v. England*, No. 01C01-9702-CR-00064, 1998 WL 155584 (Tenn. Crim. App. Mar. 31, 1998), held that the requirement applied to all single vehicles. But in *United States v. McKissack*, 76 F. Supp. 2d 836, 838 (M.D. Tenn. 1999), a federal district court held that the statute did not apply to single vehicles. Then, the Tennessee Supreme Court affirmed the decision of the court of appeals in *State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000), making it apparent that the statute did indeed apply to single vehicles. Despite the state supreme court's decision, in 2004 the state legislature amended § 55-9-404 to make it clear that the tag-light requirement did *not* apply to single vehicles. *See* 2004 Pub. Acts, c. 488, § 1 (eff. April 8, 2004). That means that at one time, the Murfreesboro ordinance, requiring tag lights on all vehicles, mirrored the state requirement, but after the 2004 state-law amendment the local ordinance did not change, and was then more restrictive than the state law.

it is not clear that operating a vehicle with a tag light would be considered a regulation for the "operation" of vehicles or, instead, a regulation concerning "equipment."

Regardless, even if the Murfreesboro ordinance were invalid because it conflicted with state law, Officer O'Gwynn's good-faith reliance on the validity of the law prevents the exclusionary rule from applying. In *Illinois v. Krull*, 480 U.S. 340, 356 (1987), the Court held that the exclusionary rule did not apply to an otherwise unconstitutional search because the officer was objectively reasonable in relying on the constitutionality of a state statute, and acted in good faith. In *United States v. Moreno*, 43 F. App'x 760, 767 (6th Cir. 2002), we held that *Krull* also applied to a local ordinance that was later found to be invalid by reason of other state law. *See id.* ("[B]ecause [the officer's] invocation of the Memphis ordinance as authorization for the subject traffic stop was 'objectively reasonable,' that stop is unassailable even if the ordinance is judicially voidable by reason of conflict with the federal Constitution or the law of Tennessee.") (emphasis omitted). We apply that same reasoning here. Regardless of the validity of the ordinance, the exclusionary rule does not apply in this case.

Odom's only claim regarding the invalidity of the traffic stop is that because the car was in compliance with state law, Officer O'Gwynn could not have had reasonable suspicion (or probable cause) upon which to base the traffic stop. But Officer O'Gwynn was relying on the Murfreesboro ordinance, not state law. The district court did not err in finding the stop valid.

Odom however, urges additional arguments as to why other aspects of the traffic stop required the evidence to be suppressed.

**2.**

Odom claims that Officer O'Gwynn violated the Fourth Amendment when he asked for identifying information from Odom and the other passengers. Under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), an officer may make an investigatory inquiry of a person, including asking for identification and patting down the person for weapons, if the officer has reasonable suspicion that illegal activity is afoot. While the Officer certainly had reasonable suspicion (and even probable cause) concerning Ms. Johnson's violation of the traffic ordinance, Odom argues that he had no reason to investigate Odom or any of the other passengers at that time.

In this circuit we have held that in situations similar to the present case, an officer does not violate the Fourth Amendment during a traffic stop by asking for passenger identification, even where there was no reasonable suspicion of any wrongdoing by the passengers. In *United States v. Smith*, 601 F.3d 530 (6th Cir. 2010), we held that an officer did not violate the Fourth Amendment by asking both the driver and passenger for identification, even where he had no reasonable suspicion regarding the passenger. *See id.* at 542 ("Nor was it inappropriate for [the officer] to check both whether [the driver] and [the passenger] had valid identification and whether they had any outstanding warrants."); *see also United States v. Ellis*, 497 F.3d 606, 613–14 (6th Cir. 2007).

Other circuits have confirmed that even without reasonable suspicion concerning the *passengers*, a police officer may ask the passengers for identification during a lawful traffic stop. *See United States v. Fernandez*, 600 F.3d 56, 61 (1st Cir. 2010) ("Although the [Supreme] Court has not explicitly held that an inquiry into a *passenger's* identity is permissible, its precedent inevitably leads to that conclusion."); *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) ("If

an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification." (internal citation omitted)).

We hold that Officer O'Gwynn did not violate the Fourth Amendment by asking the passengers for identification. Our precedent compels this holding. *See Smith*, 601 F.3d at 542. Because the passengers had already been detained by virtue of the lawful traffic stop, the officer's asking for their identification would not have subjected them to any significant additional intrusion.

**3.**

Odom argues that the duration of the stop made it unlawful. Once a valid traffic stop has been initiated, the scope of the stop must be limited. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). "Once the purpose of an ordinary traffic stop is completed, the officer may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995)).

The stop was not so long as to render it unlawful. Alexander gave an identification which—because it was false—the officers were unable to confirm. While Officer Haigh was attempting to determine Alexander's identity, Officer O'Gwynn discovered the gun on Alexander's person, only 10 minutes after the initial stop. The false identification and the gun qualify as something that "justif[ies] a further detention." And the entire affair took only about 30 minutes, even with the discovery of two illegal firearms.

**4.**

Odom argues that the district court erred in concluding that Officer Haigh did not violate the Fourth Amendment when he performed a pat-down on Odom, after the officer had already discovered the gun on Alexander. This is irrelevant. The pat-down of Odom resulted only in the discovery of the glovebox key. Odom's Motion to Suppress was granted with regard to his possession of the glovebox key, and during the trial the district court did not permit the government to mention that a glovebox key was involved at all.[7]

**5.**

Odom argues that the district court erred in finding that the officers lawfully searched the car. This search, of course, revealed Odom's loaded gun and a hat in the glovebox. We find that the search was lawful.

During a search incident to arrest, officers may search the passenger compartment of a car for evidence relevant to the crime of arrest if they have a reasonable belief that such evidence might be found in the vehicle. *See United States v. Nichols*, 512 F.3d 789, 796–97 (6th Cir. 2008), *abrogated in part on other grounds by Arizona v. Gant*, 129 S. Ct. 1710 (2009)). The search may

---

[7]Even if we were to address Odom's argument, the pat-down was lawful. During a lawful traffic stop, an officer is permitted to pat down the driver and any passengers for officer safety if there is a reasonable suspicion that they might be armed and dangerous. *Arizona v. Johnson*, 129 S. Ct. 781, 786–87 (2009). As the district court stated: "Having found a loaded handgun on Defendant Alexander, Officer Haigh was justified in conducting a pat-down search of Defendant Odom to look for any additional weapons that might place the officers and others in danger." Officer safety, especially during traffic stops, is a "legitimate and weighty" justification that is "too plain for argument." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (per curiam); *see also Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005) ("A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop, . . . and conducting pat-down searches upon reasonable suspicion that they may be armed and dangerous." (citations, emphasis, and internal quotation marks omitted)).

extend to containers that could contain relevant evidence, such as a locked glovebox. *Id.* at 797. In this case, the officers had already been given a false identification by Alexander and had found a firearm on his person; the officers properly searched the passenger compartment for evidence incident to Alexander's arrest. It just so happened that the evidence they discovered—the 9-mm handgun and the knit stocking cap—was later linked to Odom.

The recent case of *Arizona v. Gant*, 129 S. Ct. 1710 (2009), only strengthens the district court's holding in the instant case. *Gant* held that during a search incident to arrest, officers may lawfully search a vehicle only if the suspect is within reaching distance of the passenger compartment at that time or if the officers have a reasonable belief that evidence relevant to the crime of arrest might be found in the vehicle. *Id.* at 1723–24. But while *Gant* limited the scope of a search for safety purposes and to prevent destruction of evidence to areas within reaching distance of the subject, it did not disturb the ability of officers to search for evidence relevant to the crime of arrest. *See id.* at 1714 ("[W]e also conclude that the circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle."); *see also United States v. Johnson*, 627 F.3d 578, 584 (6th Cir. 2010) (applying *Gant*).

Because the district court held that Officer Haigh's search of Odom's person was unlawful, the court suppressed the glovebox key that Officer Haigh discovered in the course of that search and then used to open the locked glovebox. Ordinarily, the fruits of that unlawful search and seizure would be suppressed. *See United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995). But if discovery of the evidence would have been inevitable, suppression is not required. *Id.* Here, Officer

- 14 -

Haigh testified that had the officers not found the glovebox key, they would have used tools to access the locked glovebox. The district court properly held that discovery was inevitable, and that the evidence found in the glovebox should not be suppressed.

**B.**

Odom claims that the confession he gave to officers at the police station should have been suppressed because it was obtained in violation of his Fifth Amendment rights.

When reviewing the voluntariness of a confession, we review factual findings for clear error and the ultimate determination of voluntariness de novo. *United States v. Marks*, 209 F.3d 577, 581 (6th Cir. 2000).

It is well established that a confession is obtained in violation of the Fifth Amendment if it is not voluntary. *United States v. Murphy*, 763 F.2d 202, 205 (6th Cir. 1985). Whether a confession is voluntary depends upon "totality of the circumstances surrounding the confession." *Id.* Courts have considered "the age of the accused, his level of education or intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the confession to a violent arrest and the inherent coerciveness of the setting in which the confession was given." *Id.* It is difficult for a defendant to show that a confession was involuntary when he properly received advice of and waived his *Miranda* rights. *Simpson v. Jackson*, 615 F.3d 421, 432 (6th Cir. 2010).

Odom waived his *Miranda* rights at the beginning of the interview and he does not contest the validity of that waiver on appeal. Furthermore, there is nothing in the video of the confession to indicate that the officers attempted to or succeeded in overbearing Odom's will. There were three

officers in the room, each armed, but they did not brandish their weapons. They did not threaten or yell at Odom. As the district court noted, Odom seemed quite at ease regarding the process, which is understandable, since—given his lengthy criminal history—he was quite familiar with the police. The officers asked Odom the same questions repeatedly, as his answers kept changing each time. When Odom was confronted with the fact that Johnson had already told the officers that the gun belonged to him, Odom finally admitted that the gun was his, but merely confronting a suspect with additional evidence does not constitute a Fifth Amendment violation. *See Parsad v. Greiner*, 337 F.3d 175, 185 (2d Cir. 2003). Overall, the interview was rather brief—about 32 minutes. Before the interview began, Odom sat alone in the room, one arm handcuffed to the table for a mere 10 minutes. Nothing about the duration of the interview or Odom's time alone prior to the interview is extraordinary enough to raise suspicions of coercion. *See United States v. Williams*, 612 F.3d 417, 422 (6th Cir. 2010) (collecting cases where confession was found involuntary after 16 days, 5 days, and 36 hours, respectively, of repeated questioning).

Given the surrounding circumstances and the validity of the *Miranda* waiver, the district court did not err in finding that the confession was not obtained in violation of Odom's Fifth Amendment rights. Nothing about the questioning of Odom implicated interrogation techniques "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

## C.

Odom claims that the district court erred by admitting at his trial Latrice Johnson's suppression-hearing testimony. He claims that the prior testimony was impermissible hearsay and

that it violated the confrontation clause. Latrice Johnson testified at the suppression hearing on June 19, 2008. The government claims that it was unable to secure her presence at trial on September 30 and October 1, 2008, so the court permitted the government to use that prior testimony, in lieu of her actual live testimony at trial.

This court reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009). Whether certain evidence constitutes hearsay, however, is a conclusion of law that the court reviews de novo. *Id.* We review a Confrontation Clause challenge de novo. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010).

Odom claims that the district court admitted Johnson's prior testimony in violation of the Sixth Amendment Confrontation Clause. The Confrontation Clause states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 U.S. 36, 54 (2004), the Supreme Court held that the Confrontation Clause requires that testimonial out-of-court statements can only be introduced at trial if the declarant is unavailable and the defendant had adequate opportunity to cross-examine the declarant. If the witness was unavailable, the government must have at least made a "good faith effort" to secure her presence at trial. *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *overruled on other grounds by Crawford*, 541 U.S. 36.

The admission of Johnson's prior testimony satisfies the requirements of the Confrontation Clause. Here, Ms. Johnson testified earlier at the suppression hearing. At that hearing, Odom's co-defendant, Alexander, called Ms. Johnson as a witness. Odom was represented by counsel at the

suppression hearing and had every motive and opportunity to cross-examine Johnson, but chose not to.

Odom claims that the prosecution's efforts to secure Ms. Johnson's presence at trial do not constitute a "good faith effort." The question here is: "How much effort is enough?" inasmuch as it is clear that the government exerted a great deal of effort in attempting to secure her presence at trial. The government made its case for unavailability at trial by calling several witnesses to testify as to those efforts. The government showed that it subpoenaed Johnson, circulated her photo and information to local police on patrol, searched for her at the address listed on her driver's license, asked neighbors about her, asked people on the street about her, and called her father to ask about her whereabouts. All of this was to no avail. When the police finally were able to reach her by phone, Johnson stated that she would not be coming to the trial to testify and hung up. The district court found that the government's efforts were "extensive," and certainly enough to constitute a good faith effort. We agree.

Odom also claims that the admission of Johnson's prior testimony constituted inadmissable hearsay. Hearsay is defined by the Federal Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). As a general rule, the Federal Rules do not permit the use of hearsay at trial. Fed. R. Evid. 802. An exception to the hearsay rule permits the use of a hearsay statement when the declarant is unavailable at trial and the proponent of the statement uses "[t]estimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to

develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). A witness is considered "unavailable" if she "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." Fed. R. Evid. 804(a)(5). The proponent must make a "good faith effort" to secure the witness's presence for trial. *Barber v. Page*, 390 U.S. 719, 724–25 (1968).

This exception to the hearsay rule closely parallels the requirements of the Confrontation Clause. This is understandable, since the Confrontation Clause and the hearsay rule "'stem from the same roots.'" *Giles v. California*, 554 U.S. 353, 365 (2008) (quoting *Dutton v. Evans*, 400 U.S. 74, 86 (1970)). For all of the reasons that the admission of Johnson's testimony did not violate the Confrontation Clause, its admission did not violate the rule against the use of hearsay evidence. Ms. Johnson was unavailable at trial, despite the government's good-faith efforts, and Odom had an opportunity and motive to cross-examine her at the previous suppression hearing.

Odom claims that the district court should have granted his motion for a mistrial after Officer O'Gwynn stated during his trial testimony: "[T]here's some things I can't say." The officer was testifying about the events leading up to the discovery of Odom's gun in the glovebox, and was apparently trying to avoid saying anything regarding the glovebox key the officers found on Odom's person. Odom's counsel made a motion for a mistrial at that time. The district court denied it.

We review for abuse of discretion the district court's denial of a motion for mistrial. *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990). In considering whether an improper statement warrants granting a mistrial, this court considers five factors:

(1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003).

At trial, the exchange that elicited O'Gwynn's testimony was as follows:

Q. Were you present for [the interview of Odom at the police department]?

A. Yes, sir.

Q. And did the defendant confess to possessing that Taurus pistol earlier that day?

A. Yes, sir.

Q. And did he confess to having paid $175 for it?

A. Yes, sir. The reason that they were all taken up is because—
    There's some things I can't say, but the reason that they were all taken up to the police department—the main reason was because the gun was found in the hat that we had all seen him wearing that day.

The remark was unsolicited and there can be no suggestion that the government acted in bad faith to elicit the comment from O'Gwynn. The government's questioning was reasonable. The judge took no corrective action because no action was needed. The glovebox key was never mentioned and as the court pointed out, the jury would likely have had no idea as to what Officer O'Gwynn's comment referred. The comment did not constitute any part of the evidence against Odom. This brief isolated remark did not render the trial so fundamentally unfair as to warrant a mistrial, and the district court did not abuse its discretion in so holding.

**D.**

Odom claims that the district court erred regarding his sentence. He does not challenge the reasonableness of the sentence, but rather the constitutionality of the factors used to calculate his sentencing range within the guidelines. He claims that the court impermissibly used facts that were not found by a jury beyond a reasonable doubt to calculate his recommended sentence under the Sentencing Guidelines. Taking into account his two prior felonies for crimes of violence or controlled-substance offenses, the district court found his base offense level to be 24. It then raised his level to 28 because of the obliterated serial number on the gun. Finally, the court raised his offense level to 33 based on his status as an armed career criminal under the Armed Career Criminal Act. The resulting Guidelines range was 235 to 293 months.

We review de novo constitutional challenges to a federal sentencing decision. *United States v. Copeland*, 321 F.3d 582, 601 (6th Cir. 2003).

The facts used to calculate Odom's recommended sentence under the Sentencing Guidelines do not need to be found by a jury. *United States v. Booker*, 543 U.S. 220 (2005), requires that any fact which results in a mandatory increase in sentence must be found by a jury beyond a reasonable doubt. As this court has explained,

> [*Booker*] has no bearing on advisory guideline calculations, but, instead, applies only to judicially found facts used to impose a mandatory enhancement. Where, as here, a district court understands that the Guidelines are only advisory, judicial fact-finding done by the preponderance of the evidence is permissible. As we stated in *United States v. Mickens*, 453 F.3d 668, 673 (6th Cir. 2006) (collecting cases), "[b]y now, it is well established that the preponderance standard does not violate *Booker*, so long as the trial court appreciates that the guidelines are advisory, not binding."

*United States v. Sexton*, 512 F.3d 326, 330 (6th Cir. 2008) (some internal quotation marks omitted);

*see also United States v. Beasley*, 442 F.3d 386, 391 (6th Cir. 2006) ("[W]e have held that a district

court does not violate the Sixth Amendment by determining the fact and nature of a defendant's prior

convictions and using these findings to impose an increased sentence under the Armed Career

Criminal Act.").

Indeed, here the district court understood that the Guidelines were only advisory, sentencing

Odom to a term *below* the Guidelines range. Odom's complaint is meritless.

Last, Odom claims that his criminal history in the Pre-Sentence report was grossly overstated

because most of his convictions were from the 1980s and 1990s, but he cites no law supporting this

claim. Such "perfunctory" claims with little or no attempt at argumentation are deemed waived. *See*

*United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996).

### III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

**HELENE N. WHITE, Circuit Judge, concurring.** I concur in the majority's decision to affirm, but do not share all the views expressed in the majority opinion.

I conclude that the admission of Johnson's testimony from the suppression hearing was error. The issues at the suppression hearing did not concern the ownership of the gun in the glove box; Odom did not have a similar motive to develop Johnson's testimony at the suppression hearing. Nevertheless, I conclude that in light of Odom's statements to the police, the error in admitting the testimony was harmless.